## UNITED STATES, LYON ET AL. *v.* HUCKABEE.

1. Where, under the Confiscation Act of August 6th, 1861, after a libel showing a case within the act, an amended libel sets out a case which shows that there can be no confiscation under the act, both libel and amended libel should be dismissed.

2. The process prescribed by the Confiscation Acts cannot, by the union of certain claimants of land proceeded against, with the United States, otherwise than as informers, be made the means by which the conflicting titles to the land, between such person and other claimants, shall be settled.

8. Where land was sold to the so-called "Confederate States" during the rebellion, and was captured by the United States, it became on the extinction of the Confederacy, and without further proceeding, the property of the United States, and could be properly sold by them.

4. Such sale rendered any proceeding against the persons who owned the land prior to sale to the "Confederate States," wholly improper.

5. Where the agents of the said Confederacy came to persons owning iron works, and informed them that they must either contract to furnish iron at a uniform price, or lease or sell the works to the Confederacy or that they would be impressed, and the owners—then much in debt—after consultation—the works being already in charge of a guard from the Confederacy, which possessed despotic power over skilful laborers—considering that to "contract" would cause a failure of their scheme, and to lease would be ruinous, resolved to sell; *Held,* that such a sale was not made under duress.

6. Where a subordinate court, which had no jurisdiction in the case, has given judgment for the plaintiff or defendant, or improperly decreed affirmative relief to a claimant, an appellate court must reverse. It is not enough to dismiss the suit.

ERROR to the Circuit Court for the Middle District of Alabama; the case being thus :

In the year 1862, soon after the outbreak of the late rebellion, one C. C. Huckabee and three other persons, formed under the general laws of Alabama a corporation called "The Bibb County Iron Company;" Huckabee being president, and the other corporators, directors; and, with him, the only stockholders. As the name of the corporation indicates, its object was the working in iron; its particular machinery being such as made it capable of manufacturing cannon, and other munitions of war. Rolling-mills were erected, and lands, slaves, and mules bought.

When the company had thus got fairly going, the rebel government sent one of its officers to Huckabee, the presi-dent, requiring him and the corporation to make a contract with the Confederacy, to deliver iron to it at a uniform price named. [The iron had been furnished at the price named, for some time before this, but no formal contract to furnish it uniformly at that price existed.] Huckabee refused to make any such contract. Finally, being sent for again by the agents of the rebel government, he was told that the agreement under which the iron was then furnished was not a contract, and that he must make a *contract.* He then con-sulted with his stockholders, and the result was that the com-pany refused to make any contract. He was then sent for a third time, and told that the company must either contract on government terms, or lease the works, or sell them to the Confederate States, and that otherwise the works would be impressed. The company resolved, after some weeks con-sideration, to sell. The influences which operated on the owners, according to the statement of Huckabee, the presi-dent, were these:

"We owed a large amount of money, about $300,000, and our debts were increasing. We knew that if we *contracted* we could not pay our debts and get back our capital. To *lease* would have been ruinous; and as we had been informed that if we did not either contract, lease, or sell, the works would be impressed, we regarded it best to sell. I cannot say that there could not have been other reasons influencing the minds of other corporators than myself to join in the resolution author-izing the sale."

It appeared that during most of the time that the iron company had been in operation, a guard from the rebel army had been in control of it, so far as to see that it sent no iron away except to the rebel authorities. And more-over that the rebel powers possessed an almost despotic power over the whole body of skilful laborers in the region.

The sale was made, and a deed executed under the corpo-rate seal *and* the hands of the president and all the other corporators, three in number, September 13th, 1863. The

consideration was $600,000, Confederate money, which was duly paid, and after a discharge of the corporate debts, divided among the stockholders; the persons who had executed the deed. Confederate money was at this time worth one-fourteenth of the same amount in Federal money.

The deed recited that at a meeting of all the stockholders, held on September 9th, 1863, it was resolved unanimously that the president be authorized, for the sum of $600,000, to sell to the Confederate States all lands, negroes, mules, &c., and to execute deeds of *warranty;* and that the party of the second part agreed to pay the said sum for the said property, provided the *said stockholders united in the convey-ance.* The deed contained full covenants of warranty. More than a month subsequently to its date, to wit, on the 25th November, 1863, it was acknowledged before the probate judge, as having been " *executed voluntarily on the day of its date.*"

The Confederate government from that time managed the works, casting great quantities of cannon, shell, shot, and other implements of war, which were used to maintain the rebellion.

In March, 1865, the property was captured by the government army. It remained for a short time under the military forces, and was then taken possession of by the Treasury Department as captured and abandoned property, and the rebel confederacy having become now extinct, on the 3d of February, 1866, after public notice, was sold for $45,000 to Francis Lyon, for himself and others, by the Commissioner of the Bureau of Refugees, Freedmen, and Abandoned Lands, under the authority of the President and Secretary of the Treasury. Prior to the sale Lyon went to Huckabee and asked him if the title was good. He said he believed it was; and declined a suggestion of Lyon to take part in the contemplated purchase (which he said he would like to do), because he had not the money at the time. The sale having been made the money was paid, and a deed executed. The sale was confirmed by act of Congress, approved December 15th, 1866, which " released and confirmed to the

said Lyon any interest which the United States had in the land described."

Prior to all this, that is to say, on the 1st of October, 1865, the District Attorney of the United States, describing himself as "prosecuting for the United States and an informer," had exhibited an information in the District Court for the Middle District of Alabama (in which the property was), against it (describing it), "said to belong to the late so-called Confederate States of America," and praying process to enforce the seizure, condemnation, and confiscation of the same.

This proceeding was made under the act of August 6th, 1861, which enacts that if during the then existing rebellion,

"Any person or persons . . . shall purchase, or acquire, sell, or give any property . . . with intent to use or employ the same, or suffer the same to be used and employed in aiding, abetting, or promoting such insurrection or resistance to the laws, or any person or persons engaged therein, or if any person or persons being the owner or owners of any such property, shall knowingly use or employ, or consent to the use or employment of the same as aforesaid, all such property is hereby declared to be. lawful subject of prize and capture wherever found; and it shall be the duty of the President of the United States to cause the same to be seized, confiscated, and condemned.

"The Attorney-General or any district attorney of the United States in which said property may at the time be, may institute the proceedings of condemnation, and in such case they shall be wholly for the benefit of the United States; or any person may file an information with such attorney, in which case the proceedings shall be for the use of *such informer and the United States in equal parts.*"

Things stood in this way from October 1st, 1865, when this information was filed, till the 30th of May, 1866, when Lyon and his co-purchasers were in possession. On that day, Huckabee and his co-corporators in the old Bibb County Iron Company appeared as claimants of the property against which the information had been filed, asserting that *they* and no other persons were "the true and legal

owners" of it, and that the property had not been know-ingly used and employed with the consent of the owners in aiding, abetting, and promoting the rebellion, but, on the contrary thereof, that the said property was built with the money and labor of them, the said respondents, and for their sole use, and was never *voluntarily* employed in the way alleged. They set up also that they had all been pardoned for all participation in the rebellion.

On the 24th of October, 1866, the Assistant Attorney-General of the United States wrote from Washington to the District Attorney in Alabama to *dismiss* the proceedings in confiscation instituted by him, the property having been sold to Mr. Lyon by the Commissioner of the Freedman's Bureau, " unless Mr. Lyon should prefer that, *for the purpose of securing and perfecting the title,* he should desire them to be continued for his own use and benefit; and *in that case the proceedings will be carried on in the name of the United States, at the cost and charges of Mr. Lyon.*"

Soon after this, that is to say, on the 26th of November, 1866, and obviously with a view of carrying out the suggestion of securing and perfecting the title in Lyon, Lyon and his co-purchasers came forward, and were made defendants. They set out the original ownership of "The Bibb County Iron Company," the sale by it to the Confederate States, with the full knowledge of the purpose to which the property was to be applied, the capture, in March, 1865, of the property by the Federal army, and the subsequent sale and conveyance, by authority of the United States, to them.

An amended information was also filed, setting out pretty much what was in the original one, but setting out in addition the *capture of the property by the forces of the United States, and the sale and conveyance by the government to Lyon and his co purchasers, the act of Congress confirming it, all fully and in form,* but still asking process of seizure, condemnation, and confiscation as before.*

Lyon answered this amended information, setting out the

---

* The idea of Mr. Lyon apparently was that any title which the United States got by confiscation would inure to him by way of estoppel.

history down to his deed, a copy of the deed, and a copy of the act of Congress confirming his title.

Huckabee and his co-corporators also answered this amended libel, setting up that "the so-called Confederate States were not a legal government, but existed by mere force and compulsion, and that it therefore never had any capacity under the laws of the United States or under the law of nations to acquire the title to lands;" setting up also that the deed given was executed under duress.

In this state of things the case came on for hearing, when the District Court dismissed the libel and amended libel, and made a decree vesting the property in Huckabee and his ancient co-corporators or their assigns. From that decree the United States and Lyon and his co-purchasers appealed.

*Mr. J. T. Morgan, in support of the decree below:*

I. *The libel and amended libel were both rightly dismissed.*

1. As to the amended libel. This is no more than an effort to procure a confiscation under the statutes of the property *in confirmation of the title of Mr. Lyon.* The original libel was by the United States and *an* informer. The amended one *is in reality* by the United States, Lyon and his co-purchasers (in the interest of him and them) against Huckabee and the original owners. The amended answer of Lyon is but a form, an admission of and support to the main parts of the amended libel. But the Confiscation Statutes are war measures, and the use of their great powers and of their extraordinary process for any purpose which concerns only private interests is wholly anomalous and improper.

2. As to the original libel. The amended libel shows an act of Congress approved 15th of December, 1866, by which title is declared to be in the United States and to be granted to Lyon. It destroys the case made in the original libel. No ground of confiscation by the government such as the original libel sets up can therefore exist.

3. Admitting, for argument's sake, that the process prescribed in the Confiscation Acts could be used by private

persons in the anomalous way attempted by Mr. Lyon, still on his own showing he and his co-purchasers (who are, in fact, complainants against Huckabee and his co-corporators) have a perfectly good title. They allege a valid sale to the Confederate government, the capture of the property by the United States, the extinction of the Confederate government, and a sale to them by the United States confirmed by Congress. *They* do not allege any claim by anybody, or any cloud on their title. They seek to confiscate a title which, according to their own showing, has no existence whatever. If they have the perfectly good title that they allege they have, then for any disturbance to their rights they have, of course, a full, adequate, and complete remedy at law. The fact that they may *really* feel, or even know, that they have not a good title, and are seeking through the extraordinary process of a confiscation to get one, does not alter the case, so far as this proceeding is concerned.

II. *The relief given to Huckabee and the original corporators was rightly granted.*

1. The power of the Confederate States to acquire title to lands must depend on their being a government. No legal authority for their existence can be found. "Confederate States" was the name merely for certain people engaged in rebellion, a rebellion opposed by law as well as by arms throughout the United States.*

The deed therefore which was made by Huckabee and his associates passed no title to the Confederate States. There was no grantee; no person or legal entity to receive. The consideration was illegal. It was made for an illegal purpose. It conveyed lands and other property for the express purpose of assisting the military operations of the States in rebellion. It was made by persons engaged in rebellion, contrary to the statutes of the United States prohibiting conveyances of property by such persons, and the United States government, if it had the power, never waived this violation of law, and confirmed the title, nor did it do

---

* United States *v.* Keehler, 9 Wallace, 86.

any act that could be so construed until after the surrender, and after it had proceeded in court to confiscate and condemn the lands so conveyed, setting up, in its proceeding, the making of such conveyance as the ground of forfeiture.

Congress has never admitted that the government of the United States acquired title to lands from or through the Confederate States, either by capture, succession, or treaty. Such an admission necessarily implies that the Confederate States had enough of legal corporate capacity to hold a title to lands; and this fact conceded, it must have had sovereignty, for it did not pretend to hold lands otherwise than as a sovereign power.

2. The deed was made by duress. It was made under such constraint as left the grantors without that freedom of choice and will that is essential in every contract. The owners made all the resistance they could make when they refused to contract. If they contracted, they could not pay their debts and get their capital back. If they leased they were "ruined." Nothing remained but to sell or be impressed. A rebel guard was in possession of the works. They sold. Did they not sell under duress?

The American cases, including the leading one of *Foshay* v. *Fergurson,*[*] strongly support the doctrine that there is no sound distinction between cases of threat or mischief to property, or to the person or good name, "because consent is of the essence of the contract, and where there is compulsion there is no consent," and there is compulsion when one's person or property is seriously threatened with mischief, or where "a man's necessities may be so great as not to admit of the ordinary process of law, to afford him relief."[†]

*Mr. P. Phillips, contra ( for the plaintiff in error):*

Conceding that Mr. Lyon could not try the validity of this title in the way in which he sought to do it, and that

---

[*] 5 Hill (New York), 158.

[†] Collins *v.* Westbury, 2 Bay, 211; Sospartas *v.* Jennings, 1 Id. 470.

the libel and amended libel were properly dismissed, how did the court, after all, pass upon the title and award the property to the counter-claimants? If the court had no jurisdiction it ought to have dismissed the whole case; the libel, amended libel, and all the claims, leaving all parties just where they were originally.

For its deciding on the conflicting titles, its decree must certainly be reversed, and the course we speak of pursued.

It is hoped, however, that the court may find fit opportunity in reversing this decree, to express its opinion on the title set up by Huckabee and others, and so give quiet to the title which the government has conveyed to Lyon and his associates; and in this hope, and in reply to what has been said as to the merits of the title, we have to say:

The facts stated do not make duress any definition of that word as given by this court in cases* which both say the same thing, and only iterate old law.

The case of *Foshay* v. *Fergurson*,† relied on by the other side, and which carries this doctrine to its greatest length, is no support for the present case. The judge there says:

"I do not intend to say that a man can avoid his bond on the ground that it was procured by an illegal *distress on his goods;* but I entertain no doubt that a contract procured by threats and fears of battery, or the *destruction* of property, may be avoided on the ground of duress."

In this case there was no *destruction* threatened, but only *impressment*, which may be likened to a distress.

But if duress in fact existed this would not make the conveyance void, but voidable only, and a *bonâ fide* purchaser for valuable consideration, without notice, would hold the estate against the original grantor.‡

And in such a transaction, if the party on whom the duress has been practiced stands by and allows the defendant

---

* Brown *v.* Pierce, 7 Wallace, 214; Baker *v.* Morton, 12 Id. 150.

† 5 Hill, 158

‡ Fletcher *v.* Peck, 6 Cranch, 133; Bean *v.* Smith, 2 Mason, 252, 272; Somes *v.* Brewer, 2 Pickering, 184; Woods *v.* Mann, 1 Sumner, 509.

to purchase, this will bar his right of recovery. Much less will he be permitted to recover when on inquiry made by the intended purchaser he advises him that his title is good.[*]

And if a party seeks to set aside his conveyance rather than to affirm it, he can only do so by a restoration of the consideration received for it.[†]

Suppose the deed from the corporation could be avoided, for duress, this could only be done by the *corporation itself*. The corporation may and must appear by its constitutional organs or curators. The appearance of each and every member is no appearance at all.[‡]

In Broke's Abridgment, under the head of "Duress," (pl. 18) citing 21 Edward IV, 8, 14, 15, we find the following:

"*Dures ne poit este al corps politique, mes poit este al Maior de faire chose apparetignant a son office,* PER OPTIMEM OPINIONEM, *car il est teste del corporat. Imprisonment del teste del natural corps en pillorie, est imprisonment de tout le corps, car entier.*"

And in Brownlow it is said that a husband may avoid a deed on account of the duress upon his wife, and so a mayor and commonalty may avoid a deed on account of duress of imprisonment of the mayor, for there is identity of person.[§]

The title of the United States to the premises was acquired by actual capture, and also by its right of succession to the overthrown and extinct government.[‖]

It is argued that the deed was *absolutely void*, because the Confederate States were incapable of being a grantee—that it was not "a person or legal entity"—and being engaged in rebellion was opposed by law as well as arms throughout the United States.

---

[*] Doolittle *v.* McCullough, 7 Ohio State, 307.

[†] Harding *v* Handy, 11 Wheaton, 103; Norton *v.* Young, 3 Greenleaf, 33; Cushing *v.* Wyman, 38 Maine, 591; Cook *v.* Gilman, 34. New Hampshire, 556.

[‡] Broke; Title, Corporation, 28; Coke Lit., 66 B.

[§] 2 Brownlow, 276.

[‖] See United States *v.* Padelford, 9 Wallace, 540; and United States *v.* Klein, 13 Id. 136, 137.

If the Confederate government was *incapax*, in reference to a deed for land, it was equally incapable of being a party to any contract whatever, and yet we know as a fact that the government of the United States has been maintaining suits in foreign countries as the successor of the Confederate States, and claiming rights through them, and has received into the treasury millions of money derived from property sold by others to them.

It is too late—if ever it was soon enough—to raise this question; for this court, as early as 1868, in *Thorington* v. *Smith*,* described the Confederate States as " *a government,* called by publicists, *a government de facto*, but more aptly denominated a *government* of paramount force," and repeated decisions since have affirmed the same principle.

Mr. Justice CLIFFORD delivered the opinion of the court.

Pleadings, in informations for seizures upon land, or for confiscation of property, as well as in causes of admiralty or maritime jurisdiction, or in actions at law, or suits in equity, are governed by certain well-established rules of practice, which require that the allegations shall correspond with the facts as proved, and that the information, as in the case of a libel, declaration, or bill of complaint, if filed in a Federal court, shall show that the court has jurisdiction of the cause of action.† Proper parties in all cases are also required, and in all cases, except where there is a set-off or cross-action, the damages or relief sought, if the cause of action is sustained, should be adjudged and awarded to the party promoting the suit and not to a stranger; and if the cause of action is not sustained the judgment or decree should be for the opposite party, whether respondent or defendant.

Laws were passed by Congress at the commencement of the late rebellion, to prevent combinations to oppose the laws of the United States, and to provide for the confiscation of property used in the insurrection, and to that end all

---

* 8 Wallace, 9.    † McKinlay *v.* Morrish, 21 Howard, 346.

persons were forbidden by an act of Congress to "purchase or acquire, sell or give any property, of whatsoever kind or description, with intent to use or employ the same or suffer the same to be used or employed in aiding, abetting, or promoting such insurrection or resistance to the laws, or any person or persons engaged therein;" and the provision was, that if any person, being the owner of any such property, shall knowingly use or employ or consent to the use or employment of the same as aforesaid, all such property shall be the lawful subject of prize and capture wherever found, and it was made the duty of the President to cause the same to be seized, confiscated, and condemned.*

Pursuant to that act the district attorney exhibited an information against a certain tract of land, therein described, containing three thousand six hundred acres, with the improvements thereon, known as the Bibb County Iron Works, which belonged to the late Confederate States, and which, as he alleges, had been previously seized by the marshal under an order of seizure duly issued; and he also alleges that the property had, for several years, been knowingly used and employed by the owners, or with their consent, in aiding, abetting, and promoting the late insurrection and rebellion, and in aiding, abetting, and promoting persons engaged in the insurrection, rebellion, and resistance to the laws and authority of the United States, and that the property, during those years, had been knowingly used and employed by the owners, or with their consent, as a place for the mining and manufacturing of iron ore into all kinds of machinery and implements for military purposes by persons engaged in armed rebellion and resistance to the laws and public authorities, contrary to the statute in such case made and provided. Service was made and the present defendants appeared and claimed to be the true and lawful owners of the property, and they deny in separate and distinct articles in the answer every material allegation of the information. Apart from that they also allege that they have severally

---

* 12 Stat. at Large, 319,

received special pardon and full amnesty from the President for all past offences connected with the late war of the rebellion, and that they respectively have fully complied with all the terms and conditions of the several pardons, and therefore that the property should be restored to them as the rightful owners.

Prior to the rebellion the property in question was owned by a corporation known as the Bibb County Iron Company, and it appears that the present plaintiffs, at this stage of the litigation, entered their appearance in the suit, and being admitted to become parties and make claim, they alleged that the property belongs to them as the joint owners of the same; that the original owners sold the property to the late Confederate States for the sum of six hundred thousand dollars and then and there received payment in full for the same, and executed to the grantees a title-deed of the premises with full covenants of warranty, and that the purchasers took full possession of the property with all the appurtenances appertaining to the same; and they also aver that the grantors were fully advised of the objects and purposes for which the property was purchased, which were to furnish the grantees with iron to be used in manufacturing arms and munitions of war to be used in prosecuting the rebellion, and that the same was held, used, occupied, and enjoyed by the grantees as the undisputed owners until the same was captured by our military forces, having been used throughout that period as the efficient means of furnishing iron for arms, cannon-balls, and shells; that the property was subsequently captured from the Confederate States by our military forces and was put up and sold at public auction by the Assistant Commissioner of the Bureau of Refugees, Freedmen, and Abandoned Lands, who was authorized and lawfully empowered to sell and convey the same in that manner, and that the plaintiff claimants, or one of them, in behalf of himself and the others, became the purchasers for the sum of forty-five thousand dollars, that being the highest and best bid made for the same, and that the said commissioner, being thereto duly authorized by the President and

Secretary of the Treasury, conveyed the property to the plaintiff claimants.

Beyond doubt those allegations were entirely inconsistent with the theory of the original information, as they show that the property, at the time the information was filed, was vested in the grantees of the United States, by virtue of a deed duly executed, and given for a valuable consideration paid by the purchasers, who, it is admitted, have never committed any such acts of forfeiture as those charged in the information. Allegations of the kind, however, are not sufficient without proof to oust the jurisdiction of the court. But the district attorney subsequently filed an amended information, and he also alleges that the property was captured from the Confederate States, and that the same was seized by order of the President, and that it was, by his order and that of the Secretary of the Treasury, sold to the highest bidder as captured property belonging to the United States, and that the same was purchased, as aforesaid, by the plaintiff claimants for the sum stated in the claim of the grantees. Such an averment in the information is sufficient proof of the fact, as against the prosecutor, especially as he confirms the allegation by referring to the act of Congress, which provides that any interest which the United States have in the lands described in the deed . . . be and the same is hereby released and confirmed to the said grantees.*

Absolute condemnation of the property to the United States was claimed in the first pleading, but the district attorney substantially admits, in the amended information, that no such decree can be entered, as he avers that the property is liable to condemnation, in confirmation of the title of the grantees under the United States, which would be a proceeding wholly without precedent in the jurisprudence of the United States.

Responsive to that, the present defendants filed an amended answer excepting to the amended information; because it

---

* 14 Stat. at Large, 616.

appears that the United States have no longer any interest in the prosecution, as they have released their right in the property to the other claimants, and because the jurisdiction of the court is ousted as relates to the property sought to be condemned.

It also appears that C. C. Huckabee, one of the present defendants, filed a separate answer, in which he alleges that he is the sole owner of a certain described portion of the lands mentioned in the information; and he also avers that the deed conveying the same to the Confederate States, which he and his associates gave, was executed under duress, and in obedience to the commands of an unlawful power, which neither he nor they could resist, and that the deed is void on that account; and he denies that the lands were ever captured by our military forces, or that the lands were ever seized under any warrant of seizure, as alleged in the information. Hearing was had upon the merits before the court, the parties having waived a jury and filed a stipulation to that effect. Witnesses were examined and other proofs were introduced, and the court entered a decree dismissing both the original and the amended informations.

Such a decree is usually regarded as exhausting the jurisdiction of the court, except in maritime cases, where there is a fund in the registry of the court to be restored to the rightful owner, but the court in this case proceeded to adjudge and decree that the claim of C. C. Huckabee, one of the defendants, be allowed and sustained to certain rights and privileges therein mentioned, including all the timber on a described portion of the lands, and the right of cutting and transporting the same, and that the title to the said described lands be adjudged to be in the said claimant, and that the marshal restore the possession of the said lands to the said claimant, and that the claim of all the defendants be sustained and allowed to another described portion of the lands in controversy, including also the right to the timber for certain purposes, and to the iron-ore in certain described localities; and it was also adjudged and decreed that the

present plaintiffs, except the United States, should pay the costs of the suit. Exceptions were taken by the present plaintiffs to the rulings of the court and to the decree, and they sued out the present writ of error.

Evidence of the most satisfactory character, consisting of the deed signed by the corporation and by the several defendants, who owned all of the stock of the company, was introduced by the United States to show that the lands and improvements in question were conveyed by the original owners to the Confederate States, and that the purchasers paid to the grantors the agreed consideration of six hundred thousand dollars, and it appeared that they entered into full possession of the premises and used and employed the lands and improvements for the purposes alleged in the amended information. Equally satisfactory evidence was also introduced by the United States to show that the entire property was captured by our military forces during the war of the rebellion, and that the whole premises were sold under the orders of the President, as alleged, and that the same were conveyed by the commissioner who conducted the sale for the consideration of forty-five thousand dollars to the plaintiff claimants, or to one of them, for his benefit and that of his associates.

Subsequent to the capture by our military forces, the possession of the lands and improvements was continued in the United States, until the sale and conveyance by the said commissioner to the present grantees, on the third of February, 1866, at which time they received possession of the premises from the commissioner, and have continued in possession of the same to the present time, under an absolute deed from the commissioner, conveying to the grantees all the right, title, and interest which the United States had in the property at the time of the sale and conveyance, which conveyance has since been confirmed by an act of Congress.*

Four principal grounds are assumed by the present de-

* 14 Stat. at Large, 616.

fendants in support of the decree dismissing the informations, and the supplemental decree granting affirmative relief to the present defendants: (1.) That private persons, other than mere informers, cannot join with the United States in prosecuting an information for the confiscation of property, nor can the United States prosecute such a suit for the mere purpose of confirming the title of a third party. (2.) That the jurisdiction of the court was ousted by the sale and conveyance of the property to the grantees in the deed from the said commissioner, it also appearing that the conveyance was subsequently confirmed by an act of Congress. (3.) That the property was not subject to capture by our military forces, as the deed from the original owners to the Confederate States was void, having been executed by the owners of the property under duress. (4.) That if the grantees under the United States have a good title, then the court below had no jurisdiction of the case, as they have, if disturbed in their possession, a plain, adequate, and complete remedy at law.

Enough appears in the act of Congress forbidding the owners of property to use and employ it or to suffer it to be used and employed for such a purpose, with their consent, to show that the first objection is well taken, as it is made the duty of the President to cause the same to be seized, confiscated, and condemned, and the provision is that the proceedings for condemnation may be instituted by the attorney-general or by the district attorney of the proper district, and that the proceedings instituted by those officers "shall be wholly for the benefit of the United States;" nor is the force of the objection in any degree obviated by the fact that the same section of the act provides that any person may file an information with one of those officers, and that, in that state of the case, "the proceedings shall be for the use of such informer and the United States in equal parts," as it is clear that the latter clause of the section affords no support to the theory that private persons, other than an informer, may join with the United States in prosecuting

such an information, or that the United States may prosecute such a suit for the mere purpose of confirming the title of a third party.*

Informations of the kind should propound in distinct articles the causes of forfeiture, and should aver that the same are contrary to the form of the statute in such case made and provided, and the rule is that inasmuch as the information is in the nature of a criminal proceeding, the allegations must conform strictly to the statute upon which it is founded, which is sufficient to show that the theory of the amended information cannot be sustained.†

2. Property owned by the United States certainly is not subject to confiscation under the information in this case, and inasmuch as it appears that the property was seized, sold, and conveyed by the order of the President, as alleged in the amended information, and that the conveyance so made has been confirmed by an act of Congress, the second objection must also be sustained, as it must be assumed, in view of what is alleged in the information and fully proved, that the property at the time of the sale and conveyance belonged to the United States.

3. Duress, it must be admitted, is a good defence to a deed, or any other written obligation, if it be proved that the instrument was procured by such means; nor is it necessary to show, in order to establish such a defence, that actual violence was used, because consent is the very essence of a contract, and if there be compulsion there is no binding consent, and it is well settled that moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is sufficient in legal contemplation to destroy free agency, without which there can be no contract, because in that state of the case

---

* 12 Stat. at Large, 319; Confiscation Cases, 7 Wallace, 462; Jecker v. Montgomery, 18 Howard, 124; 2 Parsons on Shipping, 385; The Betsy, 1 Mason, 354

† The Hoppet, 7 Cranch, 389; The Caroline, Ib. 500; The Charles, 1 Brockenborough, 347; The Mary Ann, 8 Wheaton, 380; 2 Parsons M. Law, 681.

there is no consent.* Unlawful duress is a good defence to a contract if it includes such degree of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness.† Decided cases may be found which deny that contracts procured by menace of a mere battery to the person, or of trespass to lands, or loss of goods, can be avoided on that account, as such threats it is said are not of a nature to overcome the will of a firm and prudent man; but many other decisions of high authority adopt a more liberal rule, and hold that contracts procured by threats of battery to the person, or of destruction of property, may be avoided by proof of such facts, because, in such a case, there is nothing but the form of a contract without the substance.‡ Positive menace of battery to the person, or of trespass to lands, or of destruction of goods, may undoubtedly be, in many cases, sufficient to overcome the mind and will of a person entirely competent, in all other respects, to contract, and it is clear that a contract made under such circumstances, is as utterly without the voluntary consent of the party menaced, as if he were induced to sign it by actual violence; nor is the reason assigned for the more stringent rule; that he should rely upon the law for redress, satisfactory, as the law may not afford him anything like a sufficient and adequate compensation for the injury.§ Much discussion of the topic, however, is unnecessary, as the record does not exhibit any sufficient evidence, in either point of view, to support such a defence or to warrant the court in finding for the defendants upon any such ground, which is all that need be said upon the subject, as it is obvious that that objection cannot be sustained.||

* Brown *v.* Pierce, 7 Wallace, 214.

† Chitty on Contracts, 217; 2 Greenleaf on Evidence, 283.

‡ Foshay *v.* Fergurson, 5 Hill, 158; Central Bank *v.* Copeland, 18 Maryland, 317; Eadie *v.* Slimmon, 26 New York, 12; 1 Story's Equity Jurisprudence, 9th ed. 239.

§ Baker *v.* Morton, 12 Wallace, 158.

|| Ryder Wombwell Law Reports, 4 Exchequer, 39; Giblin *v.* McMullen, Law Reports, 2 Privy Council Appeals, 335.

4. Argument to show that the court below had no juris-diction of the case if the plaintiff claimants had a good title to the premises, is hardly necessary, as both the pleadings and evidence show that they were in the possession of the lands and improvements when the prosecution was com-menced. Sufficient has been remarked to show that their title is a good one as against the United States, and it is quite clear that the present defendants do not have any such stand-ing in the pleadings in this information as to give them the right to call it in question, as the suit is one in the name and for the benefit of the United States.* Such being the character of the suit, the mistake of the district attorney in supposing that it might be prosecuted to confirm the title of the plaintiff claimants, cannot have the effect to give the court any jurisdiction of the case, much less to give the court jurisdiction to determine that the title to the premises is in the defendants and to eject the plaintiffs, holding under the United States, and to decree that the possession of the lands and improvements shall be delivered to the defendants. What the district attorney expected to accomplish by con-tinuing to prosecute the information after the seizure and sale of the property by the United States is not perfectly cer-tain, unless he supposed the court might treat the informa-tion as one in the nature of a bill in equity to remove a cloud upon the title of the grantees under the United States, arising from the pretence of the present defendants that the deed which they executed to the Confederate States was void as having been procured by duress. Concede that, still it is evident that it was an attempt to accomplish what the court under such a pleading had no jurisdiction to grant, as the parties interested were citizens of the same State, and no such issue was alleged in the information, and if there had been, and the parties had been citizens of different States, it would nevertheless be clear that the court could not grant any such relief under any process founded upon the act of Congress, entitled an act to confiscate property.† Doubtless

---

* Confiscation Cases, 7 Wallace, 462.  † 12 Stat. at Large, 319.

a bill in equity would lie, in a proper court, to remove a cloud upon their title, but it is obvious that for any encroachment upon their possessions they had a plain, adequate, and complete remedy at law. They claimed title under the United States, and the record shows that the title of the United States was derived by conquest from the government of the late Confederate States. Our military forces captured the property while it was in the possession of the Confederate States as means for prosecuting the war of the rebellion, and it appears that the captors took immediate possession of the property and continued to occupy it under the directions of the executive authority until the government of the Confederate States ceased to exist and the unlawful confederation became extinct, when it was sold by the orders of the executive and conveyed to the plaintiff claimants.

All captures in war vest primarily in the sovereign, but in respect to real property, Chancellor Kent says, the acquisition by the conqueror is not fully consummated until confirmed by a treaty of peace, or by the entire submission or destruction of the state to which it belonged, which latter rule controls the question in the case before the court, as the confederation having been utterly destroyed no treaty of peace was or could be made, as a treaty requires at least two contracting parties.* Power to acquire territory either by conquest or treaty is vested by the Constitution in the United States. Conquered territory, however, is usually held as a mere military occupation until the fate of the nation from which it is conquered is determined, but if the nation is entirely subdued, or in case it be destroyed and ceases to exist, the right of occupation becomes permanent, and the title vests absolutely in the conqueror.† Complete conquest, by

---

* 1 Kent's Commentaries (11th ed.), 110; Lawrence's Wheaton (2d ed.), 55; United States *v.* Percheman, 7 Peters, 86.

† Insurance Co. *v.* Canter, 1 Peters, 511; Hogsheads of Sugar *v.* Boyle, 9 Cranch, 195; Shanks *v.* Dupont, 3 Peters, 246; United States *v.* Rice, 4 Wheaton, 254; The Amy Warwick, 2 Sprague, 143; Johnson *v.* McIntosh, 8 Wheaton, 588.

whatever mode it may be perfected, carries with it all the rights of the former government, or in other words, the conqueror, by the completion of his conquest, becomes the absolute owner of the property conquered from the enemy, nation, or state.   His rights are no longer limited to mere occupation of what he has taken into his actual possession, but they extend to all the property and rights of the conquered, state, including even debts as well as personal and real property.*

Tested by these considerations, it must be assumed for the further purposes of this investigation that the title acquired by the plaintiff claimants from the United States was a valid title, and if so, then it is clear that the court below had no jurisdiction of the cause of action alleged in the information, as the plaintiffs, if disturbed in their possession of the premises, had a plain, adequate, and complete remedy at law. Discussion of that rule of decision at this time, however, is unnecessary, as the whole subject was considered by this court in a recent case, to which reference is made as one entirely applicable in principle to the case before the court.†

Numerous exceptions were taken by the plaintiffs to the rulings of the court in admitting and rejecting evidence, several of which it is obvious were erroneous, but in the view taken of the case it is not necessary to re-examine any such questions, as the court is of the opinion that the court below had no jurisdiction to render any decree in the case upon the merits of the controversy.

Usually where a court has no jurisdiction of a case, the correct practice is to dismiss the suit, but a different rule necessarily prevails in an appellate court in cases where the subordinate court was without jurisdiction and has given

---

* Halleck's International Law, 839; Elphinstone v. Bedreechund, 1 Knapp's Privy Council Cases, 329; Vattel, 365; 3 Phillmore's International Law, 505.

† Insurance Co. v. Bailey, 13 Wallace, 621; Hipp v. Babin, 19 Howard, 271.

judgment or decree for the plaintiff or improperly decreed affirmative relief to a claimant. In such a case the judgment or decree in the court below must be reversed, else the party which prevailed there would have the benefit of such judgment or decree, though rendered by a court which had no authority to hear and determine the matter in controversy.

DECREE IN ALL THINGS REVERSED for the want of jurisdiction in the court below, and the cause remanded with directions to dismiss the case, including the original and amended informations, and the claims of all the claimants.