John L. LEWIS, Henry G. Schmidt and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

J. R. COLEMAN, individually and trading as the Coleman Red Ash Coal Company, Defendant.

Civ. A. No. 709.

United States District Court
S. D. West Virginia,
Bluefield Division.

July 25, 1966.

M. E. Boiarsky, Charleston, W. Va., Val J. Mitch, Harold H. Bacon, Charles

L. Widman, Washington, D. C., for plaintiffs.

Leon P. Miller, Welch, W. Va., J. Strother Crockett, Crockett, Tutwiler & Crockett, Welch, W. Va., for defendant.

CHRISTIE, District Judge:

This case is before the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., upon motion for summary judgment made by plaintiffs, John L. Lewis, Henry G. Schmidt and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950 (hereinafter called the Fund).

### HISTORICAL BACKGROUND

This action was instituted by the Trustees to recover certain sums of money alleged to be due the Fund upon coal produced by the defendant J. R. Coleman, individually and trading as the Coleman Red Ash Coal Company, during the period April 1, 1957 through and including December 31, 1961.

It is alleged that during the period in question defendant Coleman entered into certain collective bargaining agreements with the United Mine Workers of America (hereinafter referred to as the UM WA) known as the National Bituminous Coal Wage Agreement of 1950 as Amended (hereinafter referred to as the Agreement), under the terms of which he was required to pay a royalty of 40¢ per ton to the Fund for each ton of coal produced for use or sale.

In April of 1957, Coleman began operation of a small truck mine in McDowell County, West Virginia, known as the Coleman Red Ash Coal Company Mine No. 4. On or about April 1, 1957, Coleman signed what purports to be the National Bituminous Coal Wage Agreement of 1950 as Amended Effective October 1, 1956. About August 1, 1958, Coleman opened another mine in McDowell County known as Coleman Red Ash Coal Company No. 5, and on or about August 26, 1958, Coleman again signed a copy of the Agreement as Amended Effective October 1, 1956. On or about December 1, 1958, he signed

what purports to be the Agreement as Amended Effective December 1, 1958. During the period in question Coleman employed between five and fifteen men.

Under the terms of the Agreement as Amended, operator signators thereto agreed, among other things, to pay certain wage rates, to grant certain vacation pay rates, to check off union membership dues and initiation fees from employees' wages, as well as to make royalty payments of a specified amount to the Fund on each ton of coal produced for use or sale.

Coleman admits signing the agreements in question; however, he contends that it was understood by and between the representatives of the UMWA and him that the written agreements were not to be valid and binding, but in lieu thereof there was an oral understanding to the effect that Coleman would check off and pay union dues and assessments against his employees, keep his employees satisfied as to wages and that he should report such tonnage to the Fund as he was able to pay royalty upon and remain in business.

Coleman further contends that he was coerced into signing the agreements in question under the threat of being put out of business.

During the period April 1, 1957 to December 31, 1958, Coleman, individually and as Coleman Red Ash Coal Company, made 49 remittances to the Fund in amounts aggregating $4,213.20, representing payments for coal produced at the rate of 40¢ per ton, as evidenced by certain forms entitled "Check Letters of Advice."

In answers to interrogatories, Coleman admitted the production of 101,821.16 tons of coal during the period in question. If a royalty of 40¢ per ton is payable on the entire production in question, the amount due and owing the Fund would be $40,728.46, or a difference of $36,515.26 between the amount paid and that claimed. Plaintiffs herein seek summary judgment for this latter sum.

## MOTION FOR SUMMARY JUDGMENT

■ Before discussing separately plaintiffs' grounds in support of their motion, certain well-established principles regarding the granting of summary judgment will be reviewed. To prevail on a motion for summary judgment, it is recognized that the moving party has the burden of showing the absence of any genuine issues as to all the material facts, which, under the applicable principles of substantive law entitle him to judgment as a matter of law. 6 Moore's Federal Practice, Section 56.15(3) 2nd Ed. (1965). As stated in Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950), summary judgment " * * * should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. * * * And this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom." Nor is summary judgment proper where the judge believes he will have to direct a verdict for one party or the other on issues that have been raised, since he should ordinarily hear evidence and direct a verdict rather than attempt to try the case in advance on a motion for summary judgment. Pierce v. Ford Motor Co., 190 F.2d 910 (4th Cir. 1951).

■ On the other hand, the fact that there exists an important, difficult or complicated question of law is not a bar to a summary judgment where it is clear there is no genuine issue of a material fact. Resolution of the legal issues will not be rendered easier by going through the trial when there is no issue of fact to be tried. 6 Moore's Federal Practice, Section 56.16 2nd Ed. (1965).

The number of cases involving similar factual situations to the principal case as well as the divergent results reached in some of them testifies to the complexity as well as the importance of the issues involved.

## PLAINTIFFS' BASIC CONTENTIONS

### I—*The purported oral agreement is inadmissible under the parol evidence rule.*

In a case involving a quite similar factual situation to the instant case, Lewis v. Lowry, 295 F.2d 197 (4th Cir. 1962), (hereinafter referred to as the first Lowry case), the Court reversed the granting of a summary judgment on the grounds that the facts in the record did not clearly establish whether the situation was governed by the rule which denies enforcement of pretensive agreements or by the rule which forecloses the use of parol evidence to establish a contemporaneous oral agreement to vary the terms of a valid contract.

When the Court again considered this case, Lewis v. Lowry, 322 F.2d 453, 455 (4th Cir. 1963), (hereinafter referred to as the second Lowry case), a verdict for the operator-defendant was set aside and the case remanded for entry of judgment in favor of the plaintiff-trustees. The Court stated that the evidence fell short of condemning the written contract as not genuine; however, in doing so reference was made to the correctness of the prior decision by stating, " * * * until it had been fully developed, this evidence could not be ruled out for, if in the end it *ex facie* satisfied the principle involved, it was admissible to construct Lowry's defense: [T]hat the Agreement never became his contract and was only a sham." Of course, it is well established that parol evidence is admissible to prove the non-existence of a contract. Burke v. Dulaney, 153 U.S. 228, 14 S.Ct. 816, 38 L.Ed. 698 (1894).

In view of the statements in the two *Lowry* cases as well as the rule put forth in the *Pierce* case, supra, together with the record in the present case, it cannot be said as a matter of law that no material question of fact exists concerning the possibility of an alleged oral agreement between the parties.

### II—*National labor policy requires that written collective bargaining agreements entered into pursuant to the Labor Management Relations Act, 1947, be not varied or altered by oral side agreements.*

The Labor Management Relations Act, 29 U.S.C.A. § 158(d), in defining collective bargaining, provides in part for " * * * the execution of a written contract incorporating any agreement reached if requested by either party."

In U. M. W. A. v. Pennington, 381 U.S. 657, 666, 85 S.Ct. 1591, 1585, 14 L.Ed.2d 626 (1965), involving an action by the Fund to recover unpaid royalty payments, in which the defendant-operator therein charged the trustees and the U.M.W.A. and certain large coal operators with violation of the Sherman Antitrust Act, in that they had conspired to restrain and to monopolize interstate commerce, the Court made the following comment concerning national labor policy:

"This Court has recognized that a legitimate aim of any national labor organization is to obtain uniformity of labor standards and that a consequence of such union activity may be to eliminate competition based on differences in such standards. * * * But there is nothing in labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry. On the contrary, the duty to bargain unit by unit leads to a quite different conclusion. The union's obligation to its members would seem best served if the union retained the ability to respond to each bargaining situation as the individual circumstances might warrant, without being strait-jacketed by some prior agreement with the favored employers."

It seems clear in view of the foregoing statement that Coleman and the UMWA representatives of his individual employees could properly have

entered into a collective bargaining agreement containing different terms than those of the National Bituminous Coal Wage Agreement of 1950 as Amended. Whether or not it could properly have been an oral contract is the issue in the instant case.

In Hamilton Foundry & Machine Co. v. International Moulders & Foundry Workers, 193 F.2d 209 (6th Cir. 1952), Section 158(d) of 29 U.S.C.A. was interpreted to mean that valid oral agreements were proper in collective bargaining contracts so long as neither party requested a written instrument containing its terms. See also N. L. R. B. v. Scientific Nutrition Corp., 180 F.2d 447 (9th Cir. 1950).

On the other hand, in his dissenting opinion in first *Lowry* case, supra, Judge Soberoff contends that properly interpreted 29 U.S.C.A. § 186(c), which authorizes agreements to establish trust funds of the nature here involved, requires the collective bargaining agreement so doing to be in writing, and in the second *Lowry* case, supra, the Court states that the statutes in question imply that a collective bargaining agreement should be in writing though the Court specifically refused to hold that an oral contract similar to that asserted here was not permissible under the Labor Management Relations Act.

Plaintiffs rely strongly on the case of Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), to support their contention that national labor policy requires that collective bargaining agreements be in writing. In that case the Trustees sued an operator for non-payment of royalties and the operator in turn set up as a defense the Union's breach of contract by having engaged in strikes and work stoppages, for which he claimed the right of offset against the amount claimed by the Fund. In refusing to treat the Agreement as a typical third-party beneficiary contract, the Court stated that national labor policy required the parties to a collective bargaining agreement to express their intention in unequivocal words be-

fore they can be said to have agreed that the union's breaches of its promises should give rise to a defense against the duty assumed by an employer to contribute to a welfare fund.

The distinguishing factors between the principal case and *Benedict* are that here, there is no admission that the operator has actually agreed to the terms of the written contract regarding the payment of royalties, nor does he contend he is entitled to an offset for an amount admitted due because of any breach of the contract by the UMWA. Coleman's position is that it was understood that the written agreements were not to be enforced and that he has complied with the terms of the oral contract that supplemented the written agreements insofar as the royalty payments due thereunder are concerned.

■ It is concluded, therefore, that the national labor policy is not so well settled on this issue that Coleman is precluded as a matter of law from asserting this defense prior to an actual trial.

*III—Defendant's assertion of duress does not constitute a valid defense against Trustees' right to recover delinquent royalties.*

■ It is recognized that the threat of a lawful strike does not constitute "duress" or vitiate a collective bargaining agreement, Lewis v. Kerns, 175 F. Supp. 115 (D.C.1959); however, Coleman contends that it was not this type of threat with which he was confronted.

In United States v. Huckabee, 16 Wall. 414, 83 U.S. 414, 21 L.Ed. 457 (1873), it is said,

"Duress, it must be admitted, is a good defense to a deed or any other written obligation, if it be proved that the instrument was procured by such means * * * Unlawful duress is a good defense to a contract if it includes such degree of constraint or danger either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness."

Although in the *Benedict* case, supra, the Court did not consider the agreement in question as a typical third-party beneficiary contract, it was, nevertheless, stated in the first *Lowry* case, supra, 295 F.2d p. 199, that all the rights of the trustees,

"* * * are entirely derivitive. Their right to recover contributions from the mine operator is dependent entirely upon the real agreement between the operator and the union. The trustees have no independent right to insist that an operator make any contribution to the fund, or that it do so on the same bases and under the same formula that other operators contribute. * * * [t]he fact that the suit is brought for the benefit of the third party beneficiaries would not foreclose a defense that there was no contract or that the writing upon which the complaint is based is not, in fact, the real agreement between the operator and the union."

In the case of Pennington v. U. M. W. A., 325 F.2d 804, 819 (6th Cir. 1963), the Court by dictum (having concluded that the issue was not before them since it had not been submitted to the jury) stated that even though the contract in question had been forced upon the operator by threats and violence, thus rendering it void, the trustees' right to recovery would not be barred with respect to the coal already mined and the rights accrued thereby; however, the instant case is distinguishable in that Coleman has pleaded in addition to duress an oral contract under which he claims all the required royalty payments were made. Obviously, therefore, any degree of duress, actual or threatened, against Coleman would be a fact material to the dispute.

IV—*Defendant is estopped to deny the validity of the Agreements on the grounds that they were executed as a result of force and duress because of subsequent acts of ratification.*

The subsequent acts of ratification on which plaintiffs rely would have refer-

ence to the partial payment of royalty on forms supplied by the Fund. However, this is entirely consistent with the alleged oral contract, which included provision for some payments, that the remittances in question may have been made.

In discussing this problem in the second *Lowry* case, supra, 322 F.2d p. 456, the Court stated that, with regard to whether or not the misrepresentations of the union's agent amounted to fraud in the inducement, the operator, "* * * was obligated to renounce it (the agreement) promptly—certainly when enforcement of it against him was sought." Similarly, in Lewis v. Kerns, supra, in which duress of the nature alleged in the instant case was an issue, the Court stated that such contracts are not void but only voidable and that to render them void an election to rescind and challenge their vaidity must be made within a reasonable time.

The question in this case then becomes at what point of time Coleman would have been obligated to renounce the signed agreement. The record discloses that Coleman was first advised by the Fund that his payments were unsatisfactory, by a letter dated September 20, 1961, or approximately three months before the end of the period in question. Coleman, however, denies having received such a letter which again gives rise to a disputed issue as to a material fact. Until and unless he was advised otherwise, Coleman would have had no reason to know that the Fund was not accepting his payments in accordance with the alleged oral contract.

Notwithstanding the reasons already advanced which tend to uphold defendant's position, there are certain undisputed facts contained in this record which, however, compel a contra decision.

The Fund of which plaintiffs are trustees is an irrevocable trust created by the National Bituminous Coal Wage Agreement of 1950, pursuant to Section 302(c) of the Labor Management Rela-

tions Act, 29 U.S.C.A. § 186(c) (5), which provides in part:

"(W)ith respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, that * * * (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, * * *."

The National Bituminous Coal Wage Agreement of 1950 provides under the heading "United Mine Workers of America Welfare and Retirement Fund of 1950," in the seventh paragraph of Section A, that,

"It is further agreed that the detailed bases upon which payments from the Fund will be made shall be resolved in writing by the aforesaid Trustees at their initial meeting, or at the earliest practicable date that may by them thereafter be agreed upon." [1]

The affidavit of Thomas G. McMillian, plaintiffs' Accountant-Reviewer, states that during the period April 1, 1957 through and including December 31, 1961, twenty-seven employees of the Coleman Red Ash Coal Company held valid hospital-medical cards entitling them to fund benefits. Coleman has not denied the validity or accuracy of this number and has admitted in his deposition that he assumed his employees had such cards.

It has been stated that the mere possession of such cards over a period of time is a valuable right, Lewis v. Mearns, 168 F.Supp. 134 (D.C.1958), and al-

though the record does not disclose that the cards were used or actual benefits were received by their holders, the issuance of the cards would of necessity have had to have been on the conditions of payments that are required by the Act to be specified in the written agreement with the employer.

McMillian's affidavit also establishes that Henry Vance, an employee of the Coleman Red Ash Coal Company during the period September 1958 through December 1960, was awarded a pension from the Fund in June of 1962 and that the pension was based in part upon his employment with the defendant. Included with the affidavit is what purports to be a true and correct copy of a letter dated September 27, 1961, submitted by Vance and signed by Coleman in support of his pension application

Coleman has not denied any of the statements contained in the McMillian affidavit or the validity of the copy of the letter purporting to contain his signature. The record does not, however, establish that Coleman knew that the letter in question was to be used to obtain a pension from the Fund, but the inference is strong that he did.

## CONCLUSION

In view of the foregoing facts, assuming for purposes of this motion that sufficient evidence can be advanced at the trial to establish the existence of all the oral contract terms that Coleman contends exist; that is, the check off and payment of union dues, keeping the men happy as to wages, and the payment to the Fund of only such royalty as he could afford, the fact still remains that the National Labor Relations Act requires that the method of payment from the Fund be specified in a written agreement with the employer. The only evidence in this record regarding such an agreement and the only reference to such written agreement is found in the terms

---

[1]. The fact that the details of disbursement are not set out in the agreement itself would not appear to affect the validity of the Funds meeting the requirements of Section 302(c) of the Act. See Ramsey v. U.M.W.A. Welfare and Retirement Fund, 321 F.Supp. 909 (D.C.1964).

of the National Bituminous Coal Wage Agreement of 1950, which Coleman claims was not intended to be a valid contract.

██ Under these circumstances, the only legal conclusion that can be drawn from the undisputed material facts in this record is that Coleman's evidence at the most would only show an oral understanding prior to or contemporaneous with the written agreement that would tend to vary some of its terms. The law of West Virginia, where the contract in question was made and under which it must be interpreted, is clear that a verbal contract covering the subject dealt with in a written contract entered into between the parties at the time the verbal one is made cannot be established. Vance v. Ellison, 76 W.Va. 592, 85 S.E. 776 (1915).

██ By the same token, since it is clear that evidence of the oral contract is inadmissible, Coleman's defense of coercion must likewise fall. The record establishes that Coleman made payments on forms provided by the Fund, that the amount of such payments were calculated on the basis of 40¢ per ton (the amount required under the terms of the agreement), and that his employees were the recipients of the Fund's benefits. Under such circumstances, the holdings of the second *Lowry* case, supra; Lewis v. Kerns, supra; and Lewis v. Owens, 338 F.2d 740 (6th Cir. 1964), Coleman must be held to have ratified the provisions of the National Bituminous Coal Wage Agreement of 1950 as Amended. Coleman not having contended that there was an unfulfilled condition indispensable to the inception of the Agreement, the case of Lewis v. Mears, 297 F.2d 101 (3rd Cir. 1961), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962), is not applicable.

For the reasons above appearing, defendant Coleman is liable to the plaintiffs as a matter of law in the amount of $36,515.26, for which sum summary judgment will be awarded.