Argued March 3, affirmed July 22, 1976

PIO, *Respondent,*
*v.*
KELLY et al, *Appellants.*
and
ANDERSON et al, *Respondents,*
*v.*
KELLY et al, *Appellants.*
552 P2d 1301

*James B. Ruyle,* Portland, argued the cause for appellants. With him on the briefs were Wayne D. Landsverk and Sabin, Newcomb, Sabin & Meyer, Portland.

*Paul T. Bailey,* Portland, argued the cause for respondents. With him on the brief were Bailey, Doblie & Bruun, Portland.

TONGUE, J.

## TONGUE, J.

These are two consolidated suits by the trustees of trust funds established under the terms of a labor agreement to enforce payment by an employer of contributions to such funds and for an accounting to determine the amounts due under the terms of that agreement. Defendants appeal from a judgment requiring payment of contributions, liquidated damages, attorney and auditor fees and costs in the sum of $38,197.42. We affirm.

Defendants contend on this appeal that the trial court erred in sustaining demurrers to affirmative defenses alleging: (1) that defendants signed the agreement under duress by the union; (2) that at the time of signing the agreement the union "led defendant[s] to believe" that it applied only to union members; and (3) that the union failed to notify defendants of any intent to modify the agreement, as required by it, and that defendants never agreed to any such modification. Defendants also contend that the circuit court erred in accepting plaintiffs' audit as the basis for the amount awarded by its judgment.

*Summary of the evidence and proceedings.*

On December 12, 1969, defendants signed a memorandum agreement with the Oregon State Council of Carpenters agreeing to comply with all the terms of the Carpenter's Master Labor Agreement dated May 1, 1968, and of agreements establishing various trust funds and to pay into such funds the amounts provided for in such agreements.[1] Those agreements required that employers pay into such trust funds certain specified sums for "each compensable man-hour" worked by their employees.

Beginning with the month of February 1970 and continuing, with interruptions, through May 1974,

---

[1]These include a health and welfare trust fund, a pension trust fund, an apprenticeship training trust fund and a vacation savings trust fund.

defendants submitted "remittance reports" to the trustees of the trust funds. No reports, however, were filed for some months during which defendants employed employees for which contributions should have been made, as shown by a later audit report submitted by defendants. In addition, reports were filed for some months which stated affirmatively that no such employees had been employed for such months, when in fact such employees had been employed, as shown by defendants' subsequent audit. Finally, these reports showed fewer employees and fewer hours worked by such employees than shown by defendants' subsequent audit. The contributions made by defendants for the entire period totaled $2,265.62.

On June 11, 1973, the trustees of the trust funds made a request of defendants for an accounting and for an audit of defendants' records. No response was received from defendants and plaintiffs' auditor was unable to contact the defendants. Defendant Kelly testified that he had previously received no communications of any kind from plaintiffs or from the union concerning trust fund contributions.

On September 12, 1973, plaintiffs filed these lawsuits. On August 8, 1974, after a hearing on plaintiffs' complaint and one of defendants' affirmative defenses,[2] the trial court entered an order directing defendants to make their records available for audit by plaintiffs.

An auditor engaged by plaintiffs then audited such records as were then made available to him by defendants and also talked with defendant Kelly, who provided additional information. He then prepared an audit report which showed that defendants owed contributions totaling $30,203.62, not including liquidated damages. A trial was then held, at which defendants made various objections to plaintiffs' audit report

---

[2]This was an affirmative defense which was not the subject of a demurrer involved on this appeal.

and requested additional time for the submission of an accounting of their own. That request was granted.

Defendants then prepared and submitted an audit report prepared by their accountant which showed that defendants owed additional contributions totaling $12,574.76. The trial was then resumed for the taking of further testimony relating to the two audit reports. Defendants' objections to plaintiffs' audit report will be discussed in some detail in connection with defendants' assignment of error relating to that report.

After considering the evidence and arguments submitted by both parties, the trial court entered judgment in amounts based upon plaintiffs' audit report.

1. *Defendants' affirmative defense of duress.*

Defendants allege as their first affirmative defense that:

> "Defendant signed the document referred to in the complaint as Exhibit A (Exhibit A hereinafter) under duress in that the Oregon State Council of Carpenters (Union hereafter) had threatened defendant that the Union would not let defendant continue to work if he failed to sign the contract. The contract is therefore unenforceable."

In order for duress to be a defense in an action to enforce a contract the conduct complained of as constituting duress must be wrongful.[3] The same is true in actions to enforce a collective bargaining agreement.[4] Both parties discuss the problem arising under this affirmative defense in terms of threats of strikes or picketing.

Thus, plaintiffs contend that the threat of a strike or picketing is not such duress as to constitute a defense in such an action because strikes and picket-

---

[3] *Horn v. Davis,* 70 Or 498, 505, 142 P 544 (1914); 13 Williston on Contracts 671, § 1606 (3d ed Jaeger 1970).

[4] *Lewis v. Kerns,* 175 F Supp 115, 118 (SD Ind 1959).

ing are not unlawful as economic pressure to induce employers to sign collective bargaining agreements.[5]

To the contrary, defendants contend that a strike or picketing to induce them to sign the agreement involved in this case would be unlawful because it is a "pre-hire" contract and that strikes and picketing in the construction industry to force the execution of "pre-hire" contracts have specifically been held to be unlawful, based on the legislative history of § 8(f) of the National Labor Relations Act, 29 USC § 158(f), which authorizes such agreements in that industry despite the fact that the "majority status" of the union has not been established at the time of the signing of such contracts.[6] Such conduct would be unlawful,

---

[5] *Lewis v. Quality Coal Corporation,* 270 F2d 140, 143 (7th Cir 1959), *cert denied,* 361 US 929 (1960); *Lewis v. Kerns, supra,* n.3 at 118; *Line Drivers Local No. 961 v. W. J. Digby, Inc.,* 218 F Supp 519, 523 (D Colo 1963), *aff'd,* 341 F2d 1016 (10th Cir 1965).

The union makes no contention that there were any other lawful means to prevent defendants from continuing to work if they did not sign the contract, such as by legal proceedings against general contractors who might engage defendants as a subcontractor. *See Local U. No. 48 of Sheet Metal Wkrs. Int. Ass'n v. Hardy Corp.,* 332 F2d 682 (5th Cir 1964); *Orange Belt District Council of Painters No. 48 v. N.L.R.B.,* 328 F2d 534, 537 (DC Cir 1964). *But see Connell Const. Co., Inc. v. Plumbers & Steam, Local U. No. 100,* 421 US 616 (1975).

[6] Defendants cite *Sperry v. Plumber's Local 562,* 210 F Supp 743, 747-48 (WD Mo 1962), and quote from that case as follows:

" 'The then Senator John F. Kennedy, stated of a 1958 proposal almost identical with § 8(f), at 104 Cong. Rec. 10249 (daily ed. June 16, 1958):

" ' "It was not the intention of the Committee to require the making of a prehire agreement, but rather to permit them; nor was it the intention of the Committee to authorize a labor organization to strike, picket, or otherwise coerce an employer to sign a prehire agreement where the majority status of the union had not been established. The purpose of this section is to permit voluntary prehire agreement. This is because of the inability to conduct representation elections in the construction industry."

" 'Representative Barden agreed with the above statement at 105 Cong. Rec. 16630 (daily ed. Sept. 4, 1959).

" 'A statement by the House Manager is contained in H.R. Rep. No. 1147, 86th Cong., 1st Sess. 42. He stated:

" ' "Nothing in Section 8(f) is intended * * * to authorize the

according to defendants, because it would constitute an unfair labor practice under § 8(b)(7)(C) of the National Labor Relations Act, 29 USC § 8(b)(7)(C).

To this contention plaintiffs respond that even if such a strike or picketing would have been unlawful as an unfair labor practice in this case, defendants' exclusive remedy in such an event was by the filing of an unfair labor practice charge with the National Labor Relations Board under § 10(b) of that Act, 29 USC § 160(b), within six months from the alleged violation, as required by the terms of that Act.[7] Plaintiffs also cite cases holding that in actions to enforce contracts for contributions to union pension funds in which defendants contend that such contracts are unenforceable because of duress, as well as misrepresentations, such contentions will be rejected when it appears that such defendants have made contributions to such funds for some time and have failed to take steps promptly to rescind such contracts for duress.[8]

Defendants contend, however, that there could be no ratification of this contract "so long as the duress continues," and that "it will require proof by plaintiffs

---

use of force, coercion, strikes or picketing to compel any person to enter into such prehire agreement."

Defendants also quote from *Sperry* as follows:

" 'Thus, it seems clear from the legislative history of § 8(f), even though not from the statute itself, that there was no intention to legalize picketing by reason of § 8(f), which otherwise is made an unfair labor practice under § 8(b)(7)(C).' "

Defendants also cite *NLRB v. International Hod Carriers Etc.,* 285 F2d 397, 403 (8th Cir 1960), and *NLRB v. Local 542, International Union of Operating Eng.,* 331 F2d 99, 106 (3d Cir 1964), and *Connell Const. Co., Inc. v. Plumbers and Steam. Local U. No. 100,* 421 US 616 (1975).

Plaintiffs contend that these cases are not in point for various reasons. Because of the basis for our decision in this case we need not decide that question.

[7] Plaintiffs cite *San Diego Unions v. Garmon,* 359 US 236 (1959), and *Motor Coach Employees v. Lockridge,* 403 US 274 (1971).

[8] *Boyle v. North Atlantic Coal Corporation,* 331 F Supp 1107, 1109 (DC WD Pa 1971); *Lewis v. Kerns, supra,* n.3.

[ 591 ]

to establish that the duress ceased and ratification then took place."[9]

Assuming, however, as a matter of pleading, that defendants alleged sufficient facts to constitute a defense and that the trial court erred in sustaining plaintiffs' demurrer to that defense, it does not necessarily follow that we must reverse this case and remand it for a trial on the issues raised by that affirmative defense. A trial court will not be reversed for an error in a ruling on a motion or demurrer to pleadings if the case has proceeded to trial and if it appears affirmatively from the record as a whole that no prejudice resulted from such a ruling.[10] This is particularly true where, as in this case, the proceeding is in equity, with the result that we try the case *de novo* on appeal on the record as made in the trial court.

In this case we are satisifed that no prejudice resulted from the sustaining of plaintiffs' demurrer to defendants' affirmative defense of duress because it affirmatively appears from the record that defendants could not have prevailed with that defense by reason of the following facts:

(1) Defendants' affirmative defense alleged that the defendant Kelly "signed the document referred to in the amended complaint as Exhibit A" under duress.

(2) That contract, as signed on December 12, 1969, included the following provision:

"This memorandum Agreement shall remain in full force and effect until May 31, 1971 and shall continue from year to year thereafter unless either party shall give written notice to the other of a desire to change or cancel it at least sixty days prior to May 31, 1971, or May 31 of any succeeding year. * * *"

---

[9] *Heider v. Unicume,* 142 Or 410, 422, 14 P2d 456, 20 P2d 384 (1933).

[10] *See Pittsburg, C., C & St. L.R. Co. v. Rushton,* 90 Ind App 227, 148 NE 337, 340-41 (1925); *State v. Pashall,* 118 Conn 645, 174 A 175, 177 (1934). *Cf. Barry v. Oregon Trunk Railway,* 197 Or 246, 255, 253 P2d 260 (1953); *Wells v. Nibler,* 189 Or 593, 599, 221 P2d 583 (1950); *Longfellow v. Huffman,* 57 Or 338, 343, 112 P 8 (1910). See also ORS 16.660.

(3) Evidence offered on trial showed that defendants made "remittance reports" to the trustees of the pension funds in question, with payments of contributions to such funds for at least some employees, and at least intermittently, during the period February 1970 to and including May 1974.

It thus appears to be clear from the record that defendants filed such reports and paid contributions to the pension funds not only throughout most of the period during which the agreement was originally effective, beginning on December 12, 1969 and ending on May 31, 1971, but that defendants continued to file at least some reports and make some payments during three one-year extensions of that agreement for periods from May 31, 1971 to May 31, 1972; from May 31, 1972 to May 31, 1973, and from May 31, 1973 to May 31, 1974.

■ It has been held that collective bargaining agreements are not "ordinary contracts" and are not "governed by the same old common law concepts which control such private contracts,"[11] but are "unique in character and a field unto themselves."[12] It has also been said that "in the field of labor law, a great change has occurred in the law of duress."[13] In any event, it is clear that because this is an action to enforce such a contract, the decision of this case is controlled by federal law, as established by the federal courts, by which this court is bound.[14]

---

[11] *Transportation Union v. U.P.R. Co.,* 385 US 157, 160 (1966).

[12] *United Packinghouse Workers v. Maurer-Neuer, Inc.,* 272 F2d 647, 649 (10th Cir 1959), *cert denied,* 362 US 904 (1960). *See also Lewis v. Mill Ridge Coals, Inc.,* 298 F2d 552, 557 (6th Cir 1962), and Jaeger, Collective Labor Agreements and The Third Party Beneficiary, 1 Boston College Ind. & Com'l L Rev 125, 139 (1960).

[13] 13 Williston on Contracts 709, § 1617 A (3d ed Jaeger 1970). *See also* 9 Williston on Contracts ch 34 (3d ed Jaeger 1970).

[14] *Schlecht v. Bliss,* 271 Or 304, 316, 532 P2d 1 (1975); *Textile Workers v. Lincoln Mills,* 353 US 448, 456-57 (1957). *Cf. Shaw v. Northwest Truck Repair,* 273 Or 452, 541 P2d 1277 (1975).

■   Although we find no federal cases discussing all of the issues raised by defendants' contentions in this case, including the contention that there can be no "ratification" of a contract signed under duress while such duress is continuing, we find several federal cases in which, under similar and even weaker facts, it has been held that an employer who has made contributions to a trust fund established under the terms of a collective bargaining agreement over a substantial period of time may not, when later sued by the union to enforce such an agreement, contend at that time that the agreement is unenforceable by reason of duress.[15] We believe that the rule of law as established in these federal cases is binding upon this court in this case.

For these reasons, and under these facts of record in this case, we conclude that defendants suffered no prejudice from any error that might have otherwise resulted from the sustaining of plaintiffs' demurrer to defendants' affirmative defense of duress.

---

[15] *Lewis v. Mill Ridge Coals, Inc.,* 188 F Supp 4, 8-9 (ED Ky 1960), *aff'd* 298 F2d 552 (6th Cir 1962), holding that an election to rescind such a contract "must be made within a reasonable time." To the same effect, *see Lewis v. Kerns, supra,* n.3; *Lewis v. Coleman,* 257 F Supp 38, 43 (SD WVa 1966); *Boyle v. North Atlantic Coal Corporation,* 331 F Supp 1107, 1109 (WD Pa 1971). *See also Lewis v. Young & Perkins Coal Company,* 190 F Supp 838, 841 (WD Ky 1960); *Line Drivers Local No. 961 v. W. J. Digby, Inc.,* 218 F Supp 519, 523 (D Colo 1963); and *Sabella v. Litchfield,* 274 Cal App 2d 195, 78 Cal Rptr 845, 847 (1969). *Cf. Lewis v. Cable,* 107 F Supp 196, 198 (WD Pa 1952); and *Schlecht v. Bliss,* 271 Or 304, 320, 532 P2d 1 (1975).
*See also* discussion in 13 Williston on Contracts 709-16, *supra,* n.12.
It also appears one of the factors considered by the courts on at least some of these cases in arriving at such a result is the fact that in an action to enforce provisions of collective bargaining agreements requiring payments into a trust fund for payment of pensions to employees, the rights of the employees are affected by the defense of duress asserted by the employer, with the result that it was considered to be "unconscionable to permit the defendant to assert this defense at this late date." *See Lewis v. Mill Ridge Coals, Inc., supra* at 9. *See also Lewis v. Benedict Coal Corp.,* 361 US 459, 468, 470 (1960); *Lewis v. Seanor Coal Company,* 382 F2d 437, 443 (3d Cir 1967), *cert denied,* 390 US 947 (1968); *Lewis v. Owens,* 338 F2d 740, 742 (6th Cir 1964); *Lewis v. Harcliff Coal Company,* 237 F Supp 6, 7 (WD Pa 1965), and *Lewis v. Cable, supra,* at 198.

## 2. *Defendants' affirmative defense of misrepresentation.*

■ Defendants' second affirmative defense alleged that:

> "At the time of the signing of Exhibit A, and at all times thereafter, the Union led defendant to believe that the contract applied only to Union members employed on Union construction projects. Defendant complied with the trust provisions of the contract with respect to such persons. Any further requirement was the result of the misrepresentations of the Union and was not the subject of an agreement by defendant and is therefore unenforceable."

These allegations would appear to be an attempt to plead that the contract signed by defendant Kelly was induced by misrepresentations and was therefore unenforceable, at least as applied to non-union employees, regardless of whether the misrepresentations were fraudulent or innocent.

If the defendants and the union had agreed that contributions to the union trust funds be made only for union members and if that was a part of the agreement between the parties, a representation by the union to that effect would not have been a false representation so as to render the agreement unenforceable. In such an event, however, defendants would have had a defense to the action by the union insofar as it sought to require contributions by defendants for non-union employees. Such a defense, however, would not have been one of misrepresentation.

In apparent recognition of this problem, defendants say that:

> "* * * The defense is that the alleged agreement signed by defendant covered only union members on union construction projects. Defendant therefore wished initally [sic] only to present evidence of the actual coverage. Only in the event that the Union intended any further contractual requirement does misrepresentation come into play."

[ 595 ]

The difficulty with that contention, however, is that defendants do not allege that it had been agreed between the parties that the contributions to the trust funds be made only for union members. Had that been the allegation, defendants could have offered evidence in support of that allegation; the union could have offered evidence to the contrary and that issue could then have been decided by a finding of fact on that conflicting evidence. In that process, any problems involving the parol evidence rule could also have been resolved, including problems arising from provisions of the trust agreements attached to the master labor agreements which defendant Kelly, by signing the memorandum agreement, agreed to observe.[16]

Defendants did not, however, allege that such was the agreement between the parties, but only that the union *represented* that the agreement signed by defendant Kelly covered only union employees. Such being the extent of defendants' allegations, it would appear that such allegations failed to allege facts sufficient to constitute such a defense.

██ In any event, any error in sustaining a demurrer to defendants' second affirmative defense as a defense intended to permit defendants "to present evidence of the actual coverage" was not prejudicial for three reasons: (1) As previously stated, in determining whether a ruling on pleadings is prejudicial this court may look to the evidence and to the record as a whole;[17]

---

[16] *See Lewis v. Seanor Coal Company,* 382 F2d 437, 442-43 (3d Cir 1967), *cert denied,* 390 US 947 (1968), and *Boyle v. North Atlantic Coal Corporation,* 331 F Supp 1107, 1108 (WD Pa 1971), holding that oral agreements at variance with written agreements regarding payments to union welfare and retirement funds are of no effect, as a matter of law, by reason of Section 302(c)(5) of the Labor-Management Relations Act, 29 USC § 186(c)(5). *See also Lewis v. Harcliff Coal Company,* 237 F Supp 6, 7-8 (WD Pa 1965). *Cf. Lewis v. Owens,* 338 F2d 740, 742 (6th Cir 1964); *Lewis v. Lowry,* 295 F2d 197 (4th Cir 1961), *cert denied,* 368 US 977 (1962), and (on retrial) 322 F2d 453 (4th Cir 1963); *Lewis v. Young & Perkins Coal Company,* 190 F Supp 838, 841 (WD Ky 1960). *But see Lewis v. Coleman,* 257 F Supp 38, 42 (SD WVa 1966).

[17] See cases and authorities cited n.9, *supra.*

(2) Defendants had previously denied allegations of plaintiffs' complaint that the terms of the agreement between the parties were as set forth in the written agreement attached to plaintiffs' complaint. Under that denial defendants were entitled to offer evidence of what they contended to be the terms of the actual agreement, without the necessity of pleading such terms as an affirmative defense;[18] (3) The terms of the written trust fund agreements offered in evidence by the union, and not controverted by any evidence offered by defendants, make it clear that contributions to the union trust funds were required for "any employee whether union or non-union."[19]

For these reasons we hold that there was no prejudicial error in sustaining plaintiffs' demurrer to defendants' second affirmative defense.[20]

### 3. *Defendants' fourth affirmative defense.*

Defendants alleged as a fourth affirmative defense that:

"II

" 'Article III of the labor agreement referenced in Exhibit A reads, in part, as follows:

" '* * * * *

" 'Section 2. Any party hereto desiring termination,

---

[18] *See Pendleton Grain Growers v. Pedro,* 271 Or 24, 25-28, 530 P2d 85 (1975). *Cf. Elston v. Wagner et al,* 216 Or 386, 390, 337 P2d 326 (1959); *Brown v. Jones,* 137 Or 520, 521-24, 3 P2d 768 (1931).

[19] Four of the 1968 trust fund agreements (by which defendants agreed to be bound, according to the agreement signed by them) defined a covered "employee" as:

"Any employee whether Union or Non-union of an Individual Employer who performs one or more hours of work of the type covered by the Collective Bargaining Agreement and any employee-member of Union or a Local Union."

The fifth trust agreement (the 1967 Construction Industry Advancement Fund agreement) covered "any employee" engaged in one or more hours of covered work.

[20] Because of the basis on which we decide this assignment of error we need not decide whether, as contended by the union, such a defense (if properly pleaded) would not be available against plaintiffs, as trustees.

modification or changes in this Agreement to take effect subsequent to *May 31, 1971,* or to take effect for any agreement year subsequent to *May 31, 1971,* shall serve written notice on the other party at interest on or before *March 1,* prior to the end of each such agreement year, requesting negotiation.'

" '* * * * *

" 'Defendant has never received such notice nor any other notice concerning the 1971-1973 contract alleged in paragraph III of the complaint, nor has defendant ever agreed to or signed such contract. Defendant is therefore not bound to the alleged 1971-1973 contract.' "

The contract provision quoted in defendants' answer was included in the Master Labor Agreement and its reference is to the parties to that agreement. However, a separate memorandum agreement was signed by defendant Kelly, and is attached as an exhibit to plaintiffs' complaint. That agreement includes the following provision:

"7. This memorandum Agreement shall remain in full force and effect until May 31, 1971 and shall continue from year to year thereafter unless either party shall give written notice to the other of a desire to change or cancel it at least sixty days prior to May 31, 1971, or May 31 of any succeeding year. *The Employer and the Unions shall be bound by any renewals or extensions of the Master Agreement and the Trust Agreements, or any new agreements, unless an appropriate written notice is given to the other party at least sixty days prior to May 31, 1971, or any subsequent year of their intent not to be bound by any new, renewed or extended agreement."* (Emphasis added)

The memorandum agreement also incorporates by reference the master agreement, "except as to such terms as are specifically excluded by this Memorandum."

It may be that the "notice" provision of the master agreement was not specifically excluded in the memorandum agreement. We believe it to be clear, however, that the "notice" provision of that agreement was intended to apply to the parties to that master

agreement and that upon signing the memorandum agreement defendants were bound by any renewals of the master agreement, as provided by § 7 of the memorandum agreement. It follows that the trial court did not err in sustaining plaintiffs' demurrer to this affirmative defense.

### 4. *Plaintiffs' audit report.*

Defendants contend that the trial court erred "in accepting plaintiffs' audit as a basis for its judgment." Thus, defendants ask this court for relief as follows:

"Specifically, we ask the court to direct the circuit court as follows:"

(a) "To exclude employees not covered by the contract because of not performing the work of installing insulation."

(b) "To exclude insulators at least for whole days in which they performed no insulation work covered by the contract."

(c) "In computing compensable hours from gross pay, to utilize the actual hourly rates and not the $4 rate which patently does not apply. More particularly:"

(1) "For insulators paid on a piece work basis to compute their actual hourly rates from their work speed."

(2) "For other insulators, to utilize their known hourly wage rates."

(3) "In the alternative, if actual hourly rates cannot be ascertained to the satisfaction of the circuit court, to utilize the contractual wage rates applicable to insulators."

### (a) *Employees not covered by contract.*

Plaintiffs' audit report included for many weeks the same employees as defendants' audit report. For other weeks, however, plaintiffs' audit report included from one to six employees not included in defendants' audit report. Defendants contend that these employees

[ 599 ]

should be excluded "because of not performing the work of installing insulation."[21]

Plaintiffs' auditor testified that in the course of preparing his audit report he not only checked such records as were available, but sought additional information from defendants. When asked why he included the names of these employees in his audit report, he said that he tried to talk with defendant Kelly, who was not available, but talked with Kelly's wife, who kept defendants' records, and also with defendants' foreman and that they both told him that "everybody" did insulation work.[22]

Defendants say that their foreman was "hostile" to them and was a union witness. Defendant Kelly did not call his wife to testify, however, but testified himself that he had some employees who did no "insulation work" and did nothing but "other kinds of work." He did not give the names of any such employees, however, and produced no records to support that contention. Similarly, the accountant who prepared defendants' audit could not give the names of any such employees, but said that he relied upon what he was told by defendant Kelly as to the work performed by the various employees and the names of the employees to include for the purpose of his audit. Also, as we read the record, the credibility of the defendant Kelly was impeached.

On this state of the record, and according proper weight to the findings by the trial judge who observed the witnesses and their demeanor we hold that the trial court did not err in refusing to reject plaintiffs'

---

[21]The trust agreements provide that "employees" covered by the provisions include those who perform "one or more hours of work of the type covered by the Collective Bargaining Agreement." The type of work covered by this collective bargaining agreement was the "installation of insulation material."

[22]Plaintiffs' audit did, however, exclude one employee who apparently worked only at defendants' shop and warehouse.

audit report upon the ground that it failed to exclude employees who were not included in defendants' audit. It is possible that there were some employees who did no insulation work in some weeks. We believe, however, that after being afforded a full opportunity to identify the names of such employees and to offer evidence to support that contention, defendants cannot now properly expect this court to remand this case to the trial court to give defendants another opportunity to do so.

(b) *Days when employees did no work covered by contract.*

■ Defendants also ask that we remand this case to the trial court with instructions "[t]o exclude insulators at least for whole days in which they performed no insulation work covered by the contract."

Plaintiffs offered the testimony of several employees who testified that in addition to the installation of insulation in houses they also, during the same days, helped unload insulation from trailers and boxcars and loaded it into trucks for transportation to the job sites and also did some preparatory and cleanup work at the job sites. None of such employees testified, however, that they ever spent any "whole days" in the performance of such work, except for one employee, who said that he might spend a day in the warehouse or shop once a month or once every two or three months. Plaintiffs also offered testimony of a union officer to the effect that from the time that insulating material is unloaded at the warehouse the work "belongs" to the carpenter's union.

Again, defendants also did not identify the names of any employees claimed to have worked any "whole days" in noncovered work or the dates when any of them may have spent any "whole days" in the performance of such work, although afforded a full opportunity to do so. Neither did defendants' accountant provide any such information.

[ 601 ]

On this state of the record we again hold that the trial court did not err in refusing to reject plaintiffs' audit report upon the ground that it failed to exclude any such days of work by any employees and that defendants cannot now properly expect that this case be remanded to the trial court with instructions to do so.

(c) *Use of hourly rate of $4 in computing compensable hours from gross pay.*

Defendants also complain of the use of the hourly rate of $4 per hour by plaintiffs' auditor in computing the compensable hours for which payments into the various trust funds were required and ask that the case be remanded to the trial court with instructions to use wage rates proposed by them for that purpose.

As previously noted, the amount of the contributions payable by defendants to the union trust funds was based upon the number of hours worked by their employees. Defendants, however, had no adequate records of the hours worked by many of their employees, due largely to the fact that many of them were paid on a piecework basis, i.e., at a specified rate per thousand feet of insulation material installed by them. As a result, it was necessary for both plaintiffs' auditor and defendants' auditor to compute the number of "compensable hours" worked by such employees based upon some other information.

Plaintiffs' auditor testified that he asked defendants for the time records of defendants' employees and that upon finding no adequate records of hours worked by many of defendants' employees he discussed the matter with defendant Kelly and was told that for tax purposes defendants used the rate of $4 per hour for employees who worked on a piecework basis and that it was a "reasonable figure" to use in determining the hours worked by such employees from their gross pay. Plaintiffs' auditor testified that, accordingly, he used that hourly rate for the purpose of computing compensable hours for such employees. That $4 per hour

was a reasonable rate to be used for such purposes was supported by the testimony of several employees who had worked on a piecework basis and who said that on such a basis their average earnings were $4 per hour or less, although some averaged more than that. Two such employees testified that after working for some time on a piecework basis they received a "raise" to a salary computed at a rate of $5 per hour.

Defendants contend, on the contrary, that computation of the number of compensable hours of work for piece rate employees from their gross pay by the use of a rate of pay as low as $4 per hour resulted in an inordinately high number of compensable hours of work. Defendants also contend that hourly rates of $6 for such employees and $9 per hour as they became "more experienced" and worked more rapidly, were more accurate, as used by defendants' auditor in his computations. The use of these higher hourly rates would result in a substantially smaller number of compensable hours upon which pension contributions were payable.

There was substantial evidence, however, that employees who worked on a piecework basis did not ordinarily earn as much as $6 per hour, much less $9 per hour. Several of such employees so testified, as previously noted. It also appears that defendants' auditor based his computation on what defendant Kelly told him to be the amount of insulation material that his employees could "hang." On that basis a skilled employee earning $9 per hour would earn $360 for a 40-hour week (or $1,440 for a four-week month). None of such employees earned that much and their usual earnings were substantially less than that amount, according to defendants' own audit report.

Upon this state of the record we hold that the trial judge did not err in refusing to reject plaintiffs' audit report upon the ground that its computation of "compensable hours" for piece rate employees was based upon a wage rate of $4 per hour. Substantial evidence

supported the use of that rate for that purpose for such employees.

As for employees for whom these were "known hourly wage rates," plaintiffs' auditor testified that he used the hourly rates of pay provided by defendants in computing the "compensable hours" for such employees and that when defendants' records, as made available to him, showed actual hours of work he used such hours in his computations.

Defendants' proposal that hourly rates for pieceworkers be based upon their "work speed" would require computations based primarily upon defendant Kelly's subjective judgment. Defendants have been afforded ample opportunity to submit what they consider to be accurate computations for these employees. As for defendants' alternative suggestion that "contractual wage rates" be used for purposes of computing "compensable hours," no evidence was offered to show that these employees were paid at such rates. As for defendants' further suggestion that this case be remanded in order that computations for "other insulators" may be based upon "their known hourly rates," plaintiffs' auditor testified that he used the hourly rates made available to him by defendants for all employees paid at hourly rates. Defendants had ample opportunity, on two separate occasions, to submit computations of "compensable hours" for such employees based upon what they contend to be their actual hourly rates and have not done so, except as set forth in the report of their auditor, as previously submitted and considered.

For all of these reasons, we agree with the decision by the trial judge and the judgment of the trial court is affirmed. Under the circumstances of this case, however, no costs will be allowed to either party.