Argued and submitted March 28, affirmed in part; reversed in part and remanded
January 9, reconsideration allowed by opinion April 24, 1991
See 106 Or App 716, 809 P2d 716 (1991)

· J. ABBOTT,
J. Upshaw, C. Anderson, L. Clinton, H. Herzberg,
H. Dick, M. Laasko, K. Twedt, J. Van Lom,
A. Norbraten, R. Cronn, Sr., H. Stover, L. Garcia,
A. Weeks, J. Kuebler and C. Kinney,
*Respondents,*

*v.*

Larry N. GOODWIN,
dba Concrete Sawing Co.,
and Concrete Sawing Co.,
*Appellants.*

(A8505-02855; CA A50908)

804 P2d 485

Thomas M. Triplett, Portland, argued the cause for appellants. With him on the briefs was Schwabe, Williamson & Wyatt, Portland.

Gary L. Tyler, Portland, argued the cause for respondents. With him on the brief was Galton, Scott & Colett, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiffs brought this action under section 301 of the Labor-Management Relations Act, 29 USC § 185 (LMRA), and section 502 of the Employee Retirement Income Security Act of 1974, 29 USC § 1132 (ERISA), to recover unpaid employer contributions to various trust funds from January, 1977, through March, 1984, and for an accounting for the period April, 1984, through 1988. The court, sitting without a jury, entered judgment for plaintiffs in the aggregate amounts of $159,698.29 for unpaid contributions, $55,742.99 in accrued interest, $19,216.69 in liquidated damages, $1,372 in costs and $34,398 in attorney fees.[1] Defendants appeal. We affirm in part, reverse in part and remand to the trial court with instructions to modify the judgment.

Plaintiffs are the trustees of the Oregon Laborers-Employers Trust Fund administered for the benefit of members of the Laborers International Union of North America, AFL-CIO (Union). Defendant Goodwin operated a sole proprietorship under the assumed name of Concrete Sawing Co., which he incorporated in June, 1980, under the same name.[2]

On May 25, 1977, before hiring any Union employees, Goodwin entered into a Laborers Compliance Agreement (prehire agreement) with the Union. Such agreements are authorized by section 8(f) of the LMRA. That agreement incorporated by reference the "Master Labor Agreement" (Master Agreement) then in effect and successive agreements[3] between the Union and the Oregon-Columbia Chapter of the Associated General Contractors of America, Inc. (Association) and the "Trust Agreement" between the Association and the Union. The Master Agreement required defendant to

---

[1] The trial court limited defendant Goodwin's personal liability to the period preceding incorporation that was not barred by a six-year Statute of Limitations —April 1, 1979, through June 30, 1980. It entered judgment against him for $9,253.26 in unpaid contributions, accrued interest of $9,753.38, $1,100.41 in liquidated damages, $34,398 in attorney fees and $686 for costs. The amounts stated in the body of the opinion are the total amounts awarded against both defendants.

[2] The parties stipulated that Concrete Sawing is bound by the labor agreements executed by Goodwin to the same extent that he is bound. For convenience, generally, we refer to defendants in the singular, except when we refer only to Goodwin.

[3] The first agreement was effective from June 1, 1975, through May 31, 1980. Although the Union and the Association entered into three successive agreements, the provisions relevant to this dispute remained unchanged.

make contributions to the applicable health, welfare, pension, training and vacation trust funds.

Because of jurisdictional claims among the crafts, when he executed the prehire agreement, Goodwin agreed that he would have a "composite crew," comprised of a plumber, a steamfitter and an electrician. He was an electrician. Shortly after executing the agreement, he hired Gibson, who became a Union member. In January, 1979, he hired May and, in 1981, he hired Ashland, both of whom joined the Union to comply with the union security clause in the Master Agreement. Defendant made contributions on their behalf during the time that they were employed; however, it made no contributions for *nonunion* employees. By December, 1982, all of the Union employees had terminated their employment and, after that date, no other person in defendant's employ was or became a member of the Union.

The prehire agreement, by its terms, remained effective during the term of the existing Master Agreement. However, either party could terminate the prehire agreement as of the expiration date of the Master Agreement by giving the other party notice, by certified or registered mail, of an intention to terminate at least 90 days in advance of the termination date.

The Master Agreement required any party desiring to modify or terminate that agreement to give written notice, by registered mail, to the other party at least 90 days before the expiration date. If that notice was not given, the contract would continue in full force and effect from year to year. However, if either party wanted to *amend or modify* the contract, the parties agreed to bargain exclusively with each other for a period of 90 days before the expiration date. If the parties failed to reach an agreement within that period, the Master Agreement would continue until the parties reached a new agreement or until either party notified the other, by registered mail, of its intent to terminate.

The Master Agreement, adopted on June 1, 1975, was due to expire on June 1, 1980. On February 25, 1980, Vermeer, Secretary of the District Council of Laborers, informed defendant that the contract was officially open for changes affecting hours, wages, fringe benefits and working conditions. Neither the Union nor defendant gave written notice to the

other of a desire to change, amend, modify or terminate that agreement. Thereafter, the parties entered into successive Master Agreements effective through May 31, 1986. On February 27, 1984, defendant, by certified mail, informed the Union of its intent to repudiate or terminate its agreement at the earliest time permitted by law.

The trial court concluded that, because the Union had attained majority status, the prehire agreement had been converted to a collective bargaining agreement, which defendant could not repudiate unilaterally. Moreover, the court held that the February 27, 1984, letter did not have the effect of terminating the Master Agreement as of May 31, 1986, and that the Master Agreement required defendant to make contributions on behalf of both Union and nonunion employees.

Because defendant's first two assignments of error are closely related, we discuss them together. Defendant contends that it either terminated or repudiated the prehire agreement, effective March 1, 1984, and that, in any event, the Master Agreement terminated no later than May 31, 1986. Plaintiffs counter with several arguments. First, under *John Deklewa & Sons, Inc.,* 282 NLRB No. 184, 124 LRRM 1190 (1987), *enforced sub nom Int'l Ass'n of Bridge, etc., Local 3 v. NLRB,* 843 F2d 770 (3rd Cir 1988) *(Deklewa),* an employer may no longer unilaterally repudiate a prehire agreement, regardless of the union's majority status. Second, because the Union had attained majority status, the prehire agreement was converted to a collective bargaining agreement, which was not terminated as provided by the contract.

In construing the LMRA, we defer to federal decisions. *See Pio v. Kelly,* 275 Or 585, 593, 552 P2d 1301 (1976); *Stone Logging Co. v. Int. Woodworkers,* 171 Or 13, 33, 135 P2d 759 (1943); *Paddack v. Furtick,* 78 Or App 49, 52, 714 P2d 1068, *rev den* 301 Or 240 (1986). As a general rule, a union must obtain majority status before it may act as the bargaining representative for a bargaining unit. *Mesa Verde Const. v. N. Cal. D. Council of Laborers,* 861 F2d 1124 (9th Cir 1988). An employer who signs a collective bargaining agreement with a union that does not represent a majority of the employer's work force commits an unfair labor practice. *NLRB v. Iron Workers,* 434 US 335, 344-45, 98 S Ct 651, 54 L Ed 2d 586 (1978). Prehire agreements are an exception peculiar to the

construction industry. 29 USC § 158(f). By using a prehire agreement, an employer and a union may enter into an agreement *before* the employees to be covered by the contract have been hired or become union members. Historically, either party could repudiate the agreement before the union attained majority status. However, once the union had attained majority status, the prehire agreement "converted" to a collective bargaining agreement, to which all statutory rights and obligations under the National Labor Relations Act attached. *Jim McNeff, Inc. v. Todd,* 461 US 260, 270-71 n 11, 103 S Ct 1753, 75 L Ed 2d 830 (1983).

Recently, however, the NLRB has concluded that repudiation frustrates, rather than facilitates, the policies underlying federal labor law. Consequently, it has held that prehire agreements bind the parties for the duration of the agreement and are not subject to repudiation. However, once the agreement expires, all collective bargaining obligations cease. In the absence of an election and the certification of an appropriate bargaining unit by the NLRB, prehire agreements no longer "convert" to collective bargaining agreements, under which an employer would be required to bargain with the union *after* the contract expires. *Int'l Ass'n of Bridge, etc., Local 3 v. NLRB, supra,* 843 F2d at 779.

■ The Court of Appeals for the Ninth Circuit, *en banc,* adopted *Deklewa's* nonrepudiation rule in *Mesa Verde Const. v. N. Cal. D. Council of Laborers, supra.* Although we are not bound by decisions of particular inferior federal courts, because we exercise concurrent jurisdiction with the federal courts over actions such as this to recover delinquent contributions, *Hannan v. R. Concrete, Inc.,* 92 Or App 361, 760 P2d 256, *rev den* 307 Or 77 (1988), under principles of federalism, we not only defer to federal court precedents, we should give weight to those of the Ninth Circuit, in which Oregon lies. *See Van de Hay v. U.S. National Bank,* 102 Or App 203, 793 P2d 1388, *rev allowed* 310 Or 475 (1990).

■ Although the NLRB has applied *Deklewa* retroactively in *administrative proceedings,* the Ninth Circuit limited its holding in *Mesa Verde* to prospective application. *Mesa Verde Const. v. N. Cal. D. Council of Laborers,* 895 F2d 516 (9th Cir 1989). We need not decide whether the rule should be applied prospectively only because, under pre-*Deklewa* law,

defendant's February 27, 1984, letter could have effectively repudiated the prehire agreement *only* if it had been received before the Union had attained majority status.[4] We agree with the trial court's conclusion that, because the Union had attained majority status before February 27, 1984, defendant could not repudiate the prehire agreement. Defendant had a stable work force of two employees, May and Ashland, during the period of the agreement. Both men became Union members pursuant to the union security clause in the Master Agreement. Although union membership is not presumed to be voluntary when there is a union security clause, *Precision Striping, Inc. v. NLRB,* 642 F2d 1144 (9th Cir 1981), we conclude that it was here, because both men retained their Union membership well after their employment with defendant ended. Plaintiffs, having proved that defendant had a permanent work force, a majority of whom were Union members, enjoy a rebuttable presumption of majority status. *IBEW v. KBR Electric,* 812 F2d 495 (9th Cir 1987). Defendant's evidence was insufficient to overcome that presumption.[5]

Alternatively, defendant contends that the prehire agreement terminated as early as February 28, 1984, but, in any event, no later than June 1, 1986. Because the Union had attained majority status and the prehire agreement had "converted" to a collective bargaining agreement, the terms of the Master Agreement controlled termination. Article V, section 2, provided:

> "Any party desiring termination or modification of this Agreement to take effect June 1, 1986, must serve, by registered mail, written notice to the other of a desire to change, amend, modify or terminate this Agreement on or before March 1, 1986. If no such written notice is given, this Agreement shall continue in full force and effect from year to year.

---

[4] We reject defendant's contention that this court lacks jurisdiction to determine the Union's past representational status. In an action such as this, it is necessary to ascertain whether the Union had established majority status in an appropriate bargaining unit before the asserted repudiation. *Operating Engineers Pension Trust v. Beck Eng. & Surveying,* 746 F2d 557, 564 (9th Cir 1984); *see also United Broth. of Carpenters and Jointers v. Endicott Enterprises, Inc.,* 806 F2d 918 (9th Cir 1986), cert den 108 S Ct 151 (1987); *J.S. Griffith Const. v. United Broth. of Carpenters,* 785 F2d 706 (9th Cir 1986); *contra: Pension Fund v. American Fire Protection,* 127 LRRM 2419 (D Md 1988).

[5] We reach the same conclusion whether we review *de novo* or for any evidence to support the findings.

It is agreed that in the event that either party should exercise its right under this paragraph to amend or modify, the parties will, for a period of 90 days prior to the expiration of this Agreement, bargain exclusively with each other with respect to all wage rates, working conditions, and hours of employment for the work herein covered. If no such agreement has been entered into at the expiration of said 90 day period, this Agreement shall continue in full force and effect until a new agreement is reached or either party notifies the other by Registered Mail of termination."

Defendant contends that the Union's letter, dated February 25, 1980, opened the contract for amendment or modification. Therefore, under the terms of the 1980 Master Agreement, the agreement would continue in full force and effect until either a new agreement was reached or either party had properly notified the other of its intent to terminate. Defendant contends that the Union letter, in combination with its termination letter dated February 27, 1984, effectively terminated the agreement. Thus, assuming that defendant complied with the provisions quoted above, June 1, 1986, would be the earliest date that it could have terminated the contract.

■ Although the provisions with reference to *amendment* and *termination* are stated separately in clear and unambiguous terms, the trial court interpreted the contract to require the parties to bargain for a period of 90 days before notice of termination could become effective. It concluded that, because defendant failed to bargain, its notice of termination was ineffective. The trial court erred in that construction of the contract.

The Master Agreement specifically distinguishes between procedures for termination and for amendment or modification. The agreement does not obligate the parties to negotiate before becoming entitled to give notice of termination. Although a party may not contractually be obligated to bargain, 29 USC § 158(d) requires any party to a collective bargaining agreement, desiring to terminate it, to give notice of intent to terminate at least 60 days before the expiration date *and* to "offer[] to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications." 29 USC § 158(d)(2).

■ Defendant complied with its statutory obligation. Its

letter of February 27, 1984, which notified the Union of its intent to terminate or repudiate the prehire agreement, stated: "We would be happy to meet and discuss with you the above matters at your earliest convenience." Defendant made the overture to meet; that is all that the statute requires. There is no evidence that the Union ever responded to defendant's offer. Therefore, defendant terminated its contractual relationship with the Union as of June 1, 1986, and its obligation to make contributions to any of the trust funds ceased on that date.

■ Defendant next contends that the trial court erred in requiring contributions on behalf of *all employees,* rather than Union members only.[6] By executing the prehire agreement, defendant agreed to make contributions to the health and welfare, pension, vacation and training trust funds and agreed to be bound by the terms and conditions of the respective trust agreements, in addition to the relevant provisions of the Master Agreement. With the exception of the training fund,[7] the Master Agreement provided that defendant would contribute to the various trust funds for the purpose of providing benefits "to all eligible employees." The term "eligible employee" is not defined. Moreover, neither the trust agreements nor the Master Agreement provide a uniform definition of the term "employee." For example, the Master Agreement defines an employee as "any person who is employed under the terms of this Agreement by an Employer." Both the health and welfare and vacation trust agreements define "employee" as "any employee of an individual employer who performs work of the type covered by the collective bargaining agreement." The

---

[6] In its letter opinion dated January 14, 1988, the court concluded that defendant owed contributions to the health and welfare, pension and vacation trust funds for Union members; contributions to the laborers' training trust fund were held to be owed for all employees, regardless of Union membership. On plaintiffs' motion for reconsideration, the court amended its letter opinion to require defendant to make contributions to the trust funds on behalf of *all* of its employees, regardless of Union membership. In reversing its original opinion, the court concluded that the Master Agreement and the trust agreements focused on the kind of work performed, rather than on the classification of the employee.

[7] Article XX of the Master Agreement provided:

"Section 1. In addition to the wage scales listed in Schedule 'A' herein, all persons, firms or corporations as listed in Schedule 'B', who are signatory parties to this Agreement, shall pay into the Oregon-Southwest Washington Laborers Training Trust Fund, or it [sic] successor, *for the purpose of training Laborers for the work in the classifications covered by this Agreement.*" (Emphasis supplied.)

pension trust agreement defines an "employee" as "an individual working for or in the employment status with an employer * * * provided such individual is a member of a bargaining unit represented by the Union * * *." In contrast, the training trust fund agreement specifically defines "employee" as "any employee, *whether union or non-union,* of any individual Employer who performs one or more hours of work of the type covered by the collective bargaining agreement * * *." (Emphasis supplied.)

Defendant contends that the agreements are ambiguous and that extrinsic evidence shows that their intent is to require contributions only for Union members. Goodwin testified that, immediately before executing the prehire agreement, representatives of the electricians, plumbers, steamfitters and laborers unions reached an agreement to sort out competing jurisdictional claims. In the light of that agreement, Goodwin understood the Master Agreement to require trust contributions based on Union membership. That may be correct, but that interpretation is not irreconcilable with the trial court's conclusion that defendant was obligated to make contributions to the *laborers trust funds,* regardless of Union membership. If, for example, an employee who performed concrete cutting work belonged to one of the trade unions, then that membership would determine the trusts to which defendant would have to contribute. However, if that employee did not belong to a union, then defendant was obligated to contribute to the Laborers' trust funds. That is consistent with the language of the trust agreement that provides benefit claims procedures for "any employee" of an individual employer and plaintiffs' interpretation of that agreement. Hughes, plaintiffs' trust coordinator, testified that the trust funds pay benefits to anyone doing laborers' work, regardless of union membership.

We agree with the trial court's interpretation, which is consistent with federal labor law. To hold that defendant had to contribute for Union members only would discriminate in favor of union membership, a practice prohibited by section 8(a)(3) of the National Labor Relations Act, 29

USC § 158(a)(3).[8] *Byrnes v. DeBolt Transfer, Inc.,* 741 F2d 620 (3rd Cir 1984). Under federal law, ambiguous labor contracts should not be interpreted to make them illegal. *Walsh v. Schlecht,* 429 US 401, 97 S Ct 679, 50 L Ed 2d 641 (1977). Accordingly, the trial court did not err in requiring contributions for all employees, regardless of Union membership.

Defendant next contends that the trial court erred in applying the six-year limitation period in ORS 12.080, the general Statute of Limitations applicable to contract actions. Relying on *Costello Del v. Int'l Broth. of Teamsters,* 462 US 151, 103 S Ct 2281, 76 L Ed 2d 476 (1983), defendant contends that the six-month limitation for unfair labor practices, 29 USC § 160(b), controls. In *Del Costello,* an employee brought an action against his employer for wrongful discharge in violation of the collective bargaining agreement and against his union for breach of its duty of fair representation. In contrast to plaintiffs' claims in the instant case, the Supreme Court concluded that the employee's claims were "inextricably inter-dependent. * * * The suit [was] not a straight-forward breach of contract suit under Section 301, as was [*Int'l Union v. Hoosier Cardinal Corp.,* 383 US 696, 86 S Ct 1107, 16 L Ed 2d 192 (1966)], but a hybrid Section 301/fair representation claim." 462 US at 165.

■ ■Although some of plaintiffs' contentions might be construed to amount to unfair labor practices, *e.g.,* refusing to bargain before termination or discriminating between union and nonunion employees for the purpose of making trust fund contributions, *B.G. Costich & Sons, Inc. v. NLRB,* 613 F2d 450 (2d Cir 1980), the gravamen of plaintiffs' complaint is a "straight-forward breach of contract suit under section 301," coupled with a prayer for an accounting. Neither the LMRA nor ERISA contains an express limitation period for such actions; therefore, we determine timeliness, as a matter of federal law, by reference to an analogous state Statute of Limitations, unless that limitation is unreasonable or otherwise inconsistent with national labor policy. *Int'l Union v.*

---

[8] Defendant contends that that section does not apply to the construction industry, relying on section 8(f) of the act. That section, however, provides that certain agreements made by employers in the construction industry, commonly referred to as prehire agreements, do not violate section 8(a)(3). It does not permit an employer to discriminate between union and nonunion employees in making contributions to union trust funds.

*Hoosier Cardinal Corp., supra,* 383 US at 705. We conclude, as did the trial court, that the general statute for actions on contracts is the most appropriate limitation for actions under a collective bargaining agreement. That period is neither unreasonable nor inconsistent with national labor policy. *See Hotel Emp., et al Health Tr. v. Elks Lodge, 1450,* 827 F2d 1324 (9th Cir 1987); *Retail Clerks Union Local No. 648 v. Hub Pharmacy,* 707 F2d 1030 (9th Cir 1983); *Sheeran v. General Electric Company,* 593 F2d 93 (9th Cir 1979).

■   Defendant contends that the liquidated damages provision in the Master Agreement is void as a penalty and, therefore, unenforceable. If the agreement were the only source for authority to award liquidated damages, defendant might have a point. The Court of Appeals for the Ninth Circuit has held that, in order for a contractual liquidated damage provision to be enforceable, the harm caused by the breach must be very difficult or impossible to estimate and the amount fixed as liquidated damages must be a reasonable forecast of the damages anticipated from the breach. *Idaho Plumbers & Pipefitters v. United Mechanical,* 875 F2d 212, 217 (9th Cir 1989). The last element requires proof of a "good faith attempt to set an amount reflective of anticipated damages." *Parkhurst v. Armstrong Steel Erectors, Inc.,* 901 F2d 796, 798 (9th Cir 1990).

Although the trial court appears to have based its award of liquidated damages on the agreement, plaintiffs alleged entitlement to them under 29 USC § 1132 *and* the agreement. In *Idaho Plumbers,* the court stated that, under section 1132(g)(2)(c)(ii), liquidated damages are mandatory if (1) the fiduciary obtains a judgment in favor of the plan, (2) unpaid contributions existed at the time the action was commenced and (3) the plan provides for them. 875 F2d at 215. All of those requirements are met here. Although plaintiffs do not argue this point, and the trial court appears to have relied solely on the agreement, the court did not err in the light of the applicable law.

Goodwin also contends that the trial court erred in awarding a single sum as attorney fees against both him and the corporation, rather than allocating the award between the two of them, because Goodwin prevailed in limiting his liability to the period ending June 30, 1980, when he incorporated. Because we have held that Concrete Sawing Co., Inc., is

not liable for contributions after May 31, 1986, and because plaintiffs incurred attorney fees in establishing the amount of contributions that they claimed after that date, their entitlement to fees must be redetermined on remand. The issue of allocation may also then be determined.

We have considered defendant's other assignments but do not believe that they need to be discussed.

Judgment reversed as to Concrete Sawing Co., Inc., for contributions after May 31, 1986, and interest and liquidated damages based on contributions found to be owing after that date and attorney fees incurred in establishing those amounts; reversed as to Goodwin on attorney fees; remanded for entry of judgment not inconsistent with this opinion; otherwise affirmed.