Argued and submitted December 5, 1980,
remanded for further proceedings June 29, 1981

GRESHAM GRADE TEACHERS ASSOCIATION,
*Petitioner - Cross-Respondent,*

*v.*

GRESHAM GRADE SCHOOL DISTRICT
NO. 4 et al
*Respondents - Cross-Appellants.*

(ERB No. C-184-78, CA 18202)

630 P2d 1304

Henry H. Drummonds, Eugene, argued the cause for petitioner, cross-respondent. With him on the briefs was Kulongoski, Heid, Durham & Drummonds, Eugene.

Susan P. Graber, Portland, argued the cause for respondents, cross-appellants. With her on the briefs were Darrell Smith, and Stoel, Rives, Boley, Fraser and Wyse, Portland.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

JOSEPH, C. J.

## JOSEPH, C. J.

This proceeding is on judicial review of an order of the Employment Relations Board (ERB) which found that Gresham Grade School District No. 4 (District) committed certain unfair labor practices during and after its 1978 contract negotiations with the Gresham Grade Teachers Association (Association). On May 30, 1980, ERB issued the order in which it found that the District refused to bargain over "student contact hours,"[1] a mandatory subject of bargaining, and unilaterally implemented an increase in those hours, in breach of its duty to bargain in good faith under ORS 243.672(1)(e). It also found that the District violated ORS 243.672(1)(h) by refusing to reduce to writing and sign a collective bargaining agreement which accurately reflected the parties' agreement. The relevant statutory provisions and the pertinent parts of the Board's order are set out in the margin.[2]

ERB's order directed the District to cease and desist from refusing to bargain over student contact hours and from continuing to implement its unilateral of the increase in those hours. It further directed the District to

---

[1] In its brief on cross-appeal, the District equates "student contact hours" with "hours a particular teacher must spend with pupils." There appears to be no dispute over this definition.

[2] ORS 243.672(1) provides, in part, that:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(e) Refuse to bargain collectively in good faith with the exclusive representative.

"* * * * *

"(h) Refuse to reduce an agreement, reached as a result of collective bargaining, to writing and sign such contract.

"* * * * *."

In its Conclusions of Law, the Board found that:

"2. The District unlawfully refused to bargain over the Association's student contact hours proposal and unlawfully implemented a change in those hours, in violation of ORS 243.672(1)(e).

"3. The District unlawfully refused to execute a collective bargaining agreement containing the parties' agreed-upon zipper clause in violation of ORS 243.672(1)(h)."

sign, on the request of the Association, a collective bargaining agreement containing language which would reflect accurately the agreement of the parties. The order did not provide other relief sought by the Association, nor did it award attorney fees. It did grant the District's motion to remove Fred Larson, the District negotiator, as a party to the order.[3]

The Association seeks review of the remedial portion of the ERB order, insofar as it did not provide for a "make-whole" remedy of compensation for extra work during the unlawfully expanded student contact hours or for the award of attorney fees. It also seeks reversal of ERB's ruling which removed Larson as a party. The District cross-petitions for review of ERB's conclusions on the merits of the unfair labor practice charges.

The Association is the exclusive bargaining representative of the bargaining unit, composed of the certificated teachers employed by the District. Larson was employed by the District as its negotiator. In April, 1978, while negotiations for a contract to cover the 1978-1980 period were underway, the District publicly announced a plan to increase the "instructional time" for students in grades four through six by extending school attendance time for those students 45 to 60 minutes per day. The Association voiced its opposition to this plan at a school board meeting on April 13, 1978.[4] On April 27, 1978, in a letter to the District, the Association president objected to the plan on the ground that it would increase student contact time and decrease teacher preparation time. The president noted that the parties were presently bargaining over student contact hours and that, should the District

---

[3] Both parties made motions for reconsideration by the Board, which were denied. In denying the Association motion for reconsideration of the remedial portion of its order, ERB stated that there was no evidence to support a pro-rata back pay claim.

[4] At the meeting, Sandy Layton, the Association president, read a "position paper," which stated in part:

"More students plus more class time equals more papers. Yet a longer day leaves less time after class for: a. Grading * * * b. Planning curriculum * * * c. Working out individualized programs * * * d. Room preparation * * * e. Extra time for individual help * * *."

adopt its plan, the Association would seek redress with the proper state agency.

Notwithstanding this protest, the District adopted its plan at its May 11, 1978, meeting. It appears from the record that sometime during contract negotiations, the Association presented a proposal covering student contact hours to the District, but it was later withdrawn. However, it is not clear from the record in what form the proposal appeared or what the precise contents of that proposal were, or when and why it was withdrawn.

On July 24, 1978, a fact finder's report on the parties' respective contract proposals was issued. It recommended against the use of language in the District's "zipper clause" proposal that:

"The employer and the Association, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement."

Instead it suggested the use of the following clause:

"Therefore, the District and the Association, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and *each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter which is covered by this Agreement."* (Emphasis supplied.)

On August 3, 1978, in response to another Association letter objecting to the plan, the District negotiator wrote:

"* * * You point out that the GGTA has determined to bargain over any increase in pupil contact hours, and that the Association demands an agreement be reached over this issue in bargaining rather than the District making a unilateral change.

"It is our understanding that your proposal in bargaining is for compensation at twice the teacher's hourly rate for instructional time in excess of 4 1/2 hours. Presumably if your proposal is simply an economic demand, as you portrayed it to the fact finder, and therefore a mandatory

subject for bargaining, then surely whatever decision regarding length of instructional day is reached by the District would simply result in a change in the amount of compensation received by affected teachers.

"If, on the other hand, you were attempting to restrict the Board's inherent right to determine the length of the instructional day, then such issue would be a permissive subject. Based on this view, we do not believe that the District is restricted in determining the length of the instructional day, and in fact, any such changes would be a proper exercise of the District's discretion.

"* * * * *"

The District's plan was implemented at the outset of the new school year on September 5, 1978.

The parties did not reach a tentative agreement until September 30, 1978, when they initialed a package of provisions. None of these provisions contained explicit language concerning student contact hours. One that was so initialed was labeled simply "fact-finder's recommendation" in reference to the zipper clause. The parties agreed that Larson, the District negotiator, would cause the package to be typed up in a "clean" draft for presentation to the Association membership for ratification. The zipper clause as it appeared in Larson's typed version read as follows:

"The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter appropriate for collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Association, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter which is covered by this Agreement. During the life of this contract, however, the parties may bargain collectively about the terms of successor collective bargaining agreements. *All terms and conditions of employment not covered by this Agreement and well-established customs and past practices shall continue to be subject to the Employer's direction and control and shall not be subject to further negotiation* or to the grievance procedure for the term thereof." (Emphasis supplied.)

Meanwhile, prior to receipt of Larson's clean draft, the Association's representatives made a "summary" of the agreement's contents as they understood them[5] and presented it to the bargaining unit members, who ratified the agreement. The District ratified the agreement as prepared by Larson, and the parties executed the Larson version on October 11, 1978.

After the discovery that the zipper clause language contained in the signed document differed in substance from that contained in the Association's summary and as initialed by the parties, the Association demanded that the District sign a new contract containing the fact finder's recommended zipper clause language. When the District refused to do so, the unfair labor practice complaint was filed.

## DISTRICT'S CROSS-PETITION

The District challenges the substantive conclusions of law contained in ERB's order. If that challenge were successful, the Association's petition would be moot. We deal, therefore, with the cross-appeal first. For the reasons set forth below, we affirm ERB's conclusions on the merits of the unfair labor practice charge.

### 1. *Student contact hours*

■ The District first contends that ERB erred in concluding that the District committed an unfair labor practice by refusing to bargain about student contact hours.[6]

---

[5] The Association's summary contained this version of the zipper clause:

"ARTICLE 26—Waiver and Scope of Bargaining

"Therefore, the District and the Association, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter which is covered by this Agreement."

[6] The District's first assignment of error is worded as follows:

"ERB erred in concluding that the District committed an unfair labor practice about the decision to lengthen the *students' instructional day:* * * *." (Emphasis supplied.)

ERB's actual conclusion was that:

"2. The District unlawfully refused to bargain over the Association's *student contact hours* proposal and unlawfully implemented a change in *those hours.* * * *" (Emphasis supplied.)

Characterizing its action as an increase in the "students' instructional day" (the "length of time pupils must be in class on a school day"), the District argues that such an increase is not a mandatory subject of bargaining.[7] It claims that the District is statutorily authorized[8] to fix the hours of instruction and that this purely managerial decision to alter the "school calendar" belongs to the District alone and not at the bargaining table. It admits that the "effects" of that decision (which may include effects upon student contact time, teacher preparation time, and teacher workday) may be[9] mandatory subjects of bargaining but maintains that it was at all times willing to bargain over the "effects" and that ERB's finding that it refused to bargain is not supported by the record. The Association, on the other hand, does not contend that a decision to increase the length of time *students* are in school (*i.e.,* the student instructional day) is a mandatory subject but, rather, that a decision to increase the length of time a *teacher* is required to spend with students during the instructional day (*i.e.,* student contact time) is. Hence, as we understand the parties' position from the briefs and from the record, there is no real dispute about what is and is not a mandatory subject of bargaining.[10] Our task, then, is only to decide whether ERB's conclusion is supported by substantial evidence.[11]

---

[7] Mandatory subjects of bargaining are those regarding "employment relations" as defined by ORS 243.650(7):

"'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures, and other conditions of employment."

*See, e.g., Eugene Ed. Assoc. v. Eugene Dist. 4J,* 48 Or App 747, 750, 617 P2d 935 (1980), *rev den* 290 Or 449 (1981).

[8] ORS 332.075(2) provides that any district school board may:

"Fix the days of the year and the hours of the day when school shall be in session."

[9] The District claims that such effects are not inevitable. For example, more personnel could be hired to take up the increase in student contact hours.

[10] Our review of the record suggests that the parties originally may simply have misunderstood each other as to what each side was claiming as to the issues raised by the extra student contact hours.

[11] ORS 183.482(8)(c) provides:

"The court shall set aside or remand the order if it finds the order is not supported by substantial evidence in the record."

The District points to its August 3, 1978, letter, *supra,* as evidence of its willingness to bargain over the effects of its decision. However, the clear implication of the District's statement therein that

"* * * surely whatever decision regarding length of instructional day is reached by the District would simply result in a change in the amount of compensation received by affected teachers"

is that it was prepared to bargain only over *compensation* for extra student contact hours and not over the *increase* in those hours. The District offered no other evidence of its willingness to bargain over the increase in student contact hours. Indeed, there was evidence to the contrary.[12] We find there was substantial evidence to support ERB's conclusion on this matter.

■      However, the District further contends that because the Association had no student contact hours proposal on the bargaining table at the time the collective bargaining agreement was reached, the District could not have refused to bargain over the subject. The District is wrong for two reasons. First, the District implemented its plan, which thereby increased student contact time, nearly 25 days *before* any final agreement was reached. Thus, the District's own pre-agreement action necessarily preempted any subsequent discussion about whether student contact hours should have been increased. A unilateral action on a mandatory subject of bargaining during negotiations is a violation of the duty to bargain in good faith. *Wasco County v. AFSCME,* 46 Or App 859, 613 P2d 1067 (1980); *see also, Labor Board v. Katz,* 369 US 736, 82 S Ct 1107, 8 L Ed 2d 230 (1962). Second, the Oregon Public Employment Collective Bargaining Act (PECBA) contains no language which suggests that mandatory subjects are bargainable only if referred to in written bargaining proposals. While a party cannot be penalized for failing to discuss a topic not

---

[12] The District negotiator stated that the District was unwilling to bargain over proposals to "place limits on student contact." The District's Personnel Manager, a member of the bargaining team, also testified that while the District was willing to bargain over extra compensation for the increase in student contact time, it would not bargain over the increase in student contact time itself.

brought to its attention as a possible subject for negotiation, that is not the situation here.

The District argues alternatively that by signing the collective bargaining agreement the Association waived any unfair labor practice claims it had against the District. *Cf. AFSCME v. Board of Higher Education,* 31 Or App 251, 570 P2d 388 (1977). The assumption which underlies this argument is that the agreement finalized the parties' rights with respect to student contact hours. This is directly related to the District's second assignment of error to which we now turn.

## 2. *Zipper clause*

The District claims that

"ERB erred in concluding that the District committed an unfair labor practice respecting the 'zipper' clause and in ordering the District to sign a new 'zipper' clause, not agreed to by the parties * * *."[13]

---

[13] The District also argues that the following language contained in the final agreement's "Management Rights" clause *by itself* empowered the District unilaterally to determine the number of student contact hours:

"* * * [I]t is expressly recognized that the employer's operation[al] and managerial responsibility includes:

"* * * * *

"4. The maintenance, control and use of the school system properties and facilities.

"* * * * *

"7. The direction and arrangement of all the working forces in the system, including the right to hire, suspend, discharge or discipline employees. The creation, combination, modification or elimination of any teaching position.

"8. The determination of the size of the working force, the allocation and assignment of work to employees, the determination of policies affecting the selection of employees and the establishment of quality standards and judgments of employee performance.

"* * * * *

"10. The right to schedule and assign work loads and to APPROVE AND AUTHORIZE textbooks, teaching aids and materials."

In order to interpret a collective bargaining agreement, it is necessary to consider the scope of other related collective bargaining agreements as well as the practice, usage, and custom pertaining to all such agreements. *Transportation-Communication Employees Union v. Union PR Co.,* 385 US 157, 87 S Ct 369, 17 L

The District essentially makes two arguments.[14] First, it claims that there is no substantial evidence to support ERB's conclusion that the parties agreed to the Association's version of the zipper clause. We disagree.[15]

■        In its second argument, the District claims that ERB has no authority to order the District to sign a new agreement.[16] It concedes that ERB is statutorily authorized to order an employer, in proper circumstances, to reduce to

---

Ed 2d 264 (1966). The interpretation of the meaning of an employment contract is properly left with the agency with expertise in the field. We defer to ERB's interpretation that the above language does not encompass student contact hours.

[14] The District did not argue that the Board improperly heard extrinsic evidence on the matter.

[15] The text accompanying the fact finder's recommended zipper clause stated:

> "It is asking too much to insist that the Association not bargain with respect to subjects 'not * * * within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.' Since the employer has requested a three year agreement, and since there are inevitably many new or overlooked subjects which arise during a three year time interval, it would be a serious mistake to shut off discussion. It is far better to discuss such matters with the exclusive bargaining representatives of the employees than to permit them to suppress them.

> "* * * * *

> "The employer is entitled to peace with respect to those issues included in the collective bargaining [sic] until the contract approaches its expiration date. But this should not be extended to subjects never discussed and a fortiori to those never contemplated. There is merit in collective bargaining as the legislature of this state has stated in the plainest terms.

> "* * * * *

> "Both parties should have the assurance that their agreement governs, rather than unwritten 'past practices or tradition.' They should start with a clean slate. However, as earlier mentioned, *for subjects not covered by the agreement, either party is free to bargain collectively, even though such subjects might also have been the subject of past practices or tradition.*" (Emphasis supplied.)

The language in the fact finder's recommended zipper clause taken together with the fact that Association had threatened to file an unfair labor practice complaint over the District's refusal to bargain about student contact hours provide substantial support for the Board's conclusion that the parties agreed to the Association's version of the zipper clause. ORS 183.482(8)(c).

[16] In *Redmond Sch. Dist. v. ERB,* 42 Or App 523, 600 P2d 943, *rev den* 288 Or 173 (1979), we expressly left open the question of whether ERB has the authority to order a party to sign a collective bargaining agreement.

writing and sign a collectively bargained agreement. However, it claims that ERB has no such authority where a written collective bargaining agreement is already in existence. We do not agree.

The legislative policy underlying ERB's authority to order the execution of a written collective bargaining agreement where none before existed also underlies ERB's authority to reform the parties' written agreement. That policy is found in ORS 243.656(5):

> "(5) It is the purpose of ORS 243.650 to 243.782 to obligate public employers, public employes and their representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations and *to enter into written and signed contracts evidencing agreements resulting from such negotiations.* * * *" (Emphasis supplied.)

Given the statutory mandate that the Board take such affirmative action as is necessary to effectuate the purposes of the PECBA in those situations where it finds an unfair labor practice has been committed, ORS 243.646(2)(c),[17] we hold that the Board has the authority to order the signing of an agreement, not only in the first instance, but also where an executed written document does not reflect the parties' bargained agreement. Furthermore, in *Pio v. Kelly,* 275 Or 585, 593, 552 P2d 1301 (1976), the Supreme Court stated that collective bargaining agreements are "not covered by the same old common-law concepts which control such private contracts, but are 'unique in character and a field unto themselves.'" Hence, the common law rules regarding reformation of private contracts do not necessarily apply to collective bargaining agreements.

---

[17] ORS 243.676(2):

"Where, as a result of the hearing required pursuant to paragraph (c) of subsection (1) of this section, the board finds that any person named in the complaint has engaged in or is engaging in any unfair labor practice charged in the complaint, the board shall:

"* * * * *

"(c) Take such affirmative action, including but not limited to the reinstatement of employes with or without back pay, as necessary to effectuate the purposes of [the PECBA]."

Finally, the District argues that ERB's order is moot insofar as it directs the District to sign a contract for a period which has ended. (ERB's order was issued on May 30, 1980; the 1978-80 contract period ended June 30, 1980.) Again, we do not agree. A written memorial of the parties' actual agreement is likely to have continuing legal significance, particularly where, as here, the legitimacy of a party's past actions depends upon rights under the agreement and will presumably affect future labor relations, negotiations and agreements.

### ASSOCIATION'S PETITION

The Association asks us to modify ERB's order to: (1) provide a "meaningful" remedy for the District's unfair labor practice, (2) make Fred Larson, the District negotiator, a party to the order and (3) award attorney fees.

### 1. *ERB's remedy*

In his recommended order, the Board agent, who conducted the hearing, proposed that

> "[t]he District shall make the said teachers whole by paying them at their regular rate of pay for the extra 45 minutes per day student-contact time from the commencement of the 1978 school year, to wit, September 5, 1978, until the District shall so cease and desist."

However, ERB, without comment, made no provision for monetary compensation to the teachers in its final order. Implicit in the Board agent's recommendation and in the Association's position on review is the assumption that the increase in instructional hours resulted in a proportionate increase in the length of the teachers' workday. ERB's statement in its denial of the Association's motion for reconsideration that there was no evidence to support a pro-rata back pay claim is a rejection of that assumption. Our function on review is not to weigh the evidence but only to determine whether the agency's conclusion is supported by substantial evidence. *Harrison v. Central Linn Sch. Dist.,* 34 Or App 221, 578 P2d 460, *rev den* 284 Or 1 (1978); *Eastep v. Vet. Med. Exam. Bd.,* 22 Or App 457, 539 P2d 1144 (1975). Thus, while the record discloses some evidence that the increase in instructional time caused *some* teachers to do work outside the required eight hour workday, we agree

with ERB that this evidence is insufficient to satisfy the Association's burden to show that a proportionate increase in work time resulted from the increase in student contact time.[18]

However, although the Association failed to establish that the District's unilateral increase extended the teacher workday, none of the parties dispute the fact that the increase proportionately extended the *teaching time* of the affected teachers. Although this change in the quality of the teachers' workday is not amenable to a post hoc precise dollar measurement, the District itself admitted that its unilateral action "would simply result in a change in the amount of compensation." *See* its August 3, 1978, letter, *supra* at 4. Thus, given that the increase in student contact hours was a mandatory subject of bargaining, that the District increased those hours unlawfully and that the parties agree that they would have bargained over some amount of extra compensation for the increase, there is merit in the Association's claim for a "make-whole" remedy. Here the Board took *no* affirmative action to effectuate the purposes of the PECBA in the face of a statutory mandate to do so. ORS 243.676(2)(c). Mindful, however, of the broad authority granted the Board to fashion remedies, ORS 243.766(3); *cf. Phelps Dodge Corp. v. NLRB,* 313 US 177, 61 S Ct 845, 85 L Ed 2d 1271 (1974), and of our role as only one of review, we must tread lightly in this area.

Where, as here, because of the agency's inaction, it is not clear that it has correctly interpreted the law requiring "affirmative action," ORS 243.676(2) (or whether it has even attempted to do so), our task on review becomes quite difficult. While we can conceive of other actions which the Board could have taken to effectuate the purposes of the Act—for example, requiring the parties to bargain over the amount of compensation due the teachers[19]—it is not our

---

[18] The Association offered in evidence seven letters from teachers describing the effects of the new student contact hours. Three of them claimed that the increased instructional time resulted in extra work outside the eight hour workday. The other four only described the adverse impact on their in-school preparation time.

[19] In this respect, we depart from the line of cases in the private sector which purport to follow *International Union of E., R. & M., W., AFL-CIO v. NLRB* [Tidee Products], 426 F2d 1243 (DC Cir 1970), *cert den* 400 US 950 (1970), where

task in the first instance to formulate proper agency action. *NLRB v. Food Store Employees,* 417 US 1, 94 S Ct 2074, 40 L Ed 2d 612 (1974). Thus, in order meaningfully to carry out our function, we remand this case to ERB for reconsideration and/or explication of its interpretation of ORS 243.676(2)(c) as it applies in the instant case.

## 2. *Liability of Fred Larson*

■ Without deciding whether ERB correctly concluded (or even that it did conclude) that Larson, the District negotiator, committed an unfair labor practice for refusal to bargain, we sustain ERB's ruling dismissing him as a party subject to its order. We are persuaded by the Board's reasoning that

"* * * it would not serve the purposes of the PERA to grant the Association separate relief against Larson, unless the record indicates that his actions were taken outside the scope of his authority as a negotiator, or were not taken at the direction of the District. If Larson remains the District's designated representative, he will be bound to follow any Board Order directed to the District. If for some reason he does not remain the District's designated representative, such an Order would have no effect."

## 3. *Attorney fees*

■ Finally, we also remand ERB's order with respect to attorney fees. At the time of ERB's May 30, 1980, final order, ORS 243.676(2)(d) was in effect:

---

compensatory damages are awarded only when an employer's refusal to bargain is found to be egregious or its defenses patently frivolous. *See, e.g., United Steelworkers of America, AFL-CIO v. NLRB,* 496 F2d 1342 (5th Cir 1974). We believe such a requirement conflicts with the generally accepted proscription against the award of punitive damages in unfair labor practice cases. *See, e.g., Florida Steel Corp. v. NLRB,* 587 F2d 735 (5th Cir 1979); *Consolidated Edison Co. v. NLRB,* 305 US 197, 59 S Ct 206, 83 L Ed 126 (1938). If punitive damages cannot be awarded in an unfair labor practice case, then whether the employer's motivation for refusal to bargain was really bad, merely bad, or not so bad is irrelevant.

Furthermore, an order limited to requiring that the parties bargain over the amount of compensation due the teachers for extra teaching does not offend the principle found in ORS 243.650(4) that, while the Board may force the parties to bargain, it may not impose contract terms upon the parties and thereby force the parties to agree. On the other hand, an outright award of monetary damages in this case would be subject to the challenge that the Board was deciding what the parties *would have agreed to* and was thereby fixing the terms of their agreement.

"Where * * * the board finds that any person named in the complaint has engaged in or is engaging in any unfair labor practice charged in the complaint, the board *shall:*

"* * * * *

"(d) Designate the amount and award attorney fees, if any, to the prevailing party." (Emphasis added.)

The mandate is clear. The Board was required to award attorney fees if any had been incurred by the Association. On remand it is entitled to exercise only the discretion it has under the statute and its own policy rule.[20]

Remanded for further proceedings.

---

[20] Although ERB rule 115-35-055 was not in existence at the time of ERB's order, its application in this case on remand, insofar as it aids in the determination of the *amount* of attorney fees, would be appropriate.